HENRY H. KIMBALL, TRUSTEE U/W ANNIE B. WEBB, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 8104.   Promulgated March 20, 1946.

*Robert C. McKay, Esq.*, for the petitioner.
*A. J. McDowell, Esq.*, for the respondent.

536

OPINION.

Arundell, *Judge*: Article IX of the Convention on Double Taxation Between the United States and The Republic of France,[1] executed April 27, 1932, proclaimed April 16, 1935, and effective January 1, 1936, provides:

The following classes of income paid in one of the contracting States * * * to a citizen of the latter State residing there, are exempt from tax in the former State:

*          *          *          *          *          *          *

(c) private pensions and life annuities.

Petitioner contends that the payments provided in the will of Annie B. Webb for Ethel Duncan constituted a "life annuity" and that those for Germaine St. Laurent constituted both a "private pension" and a "life annuity" within the meaning of the treaty.

The terms are not defined in the convention or in the protocol, and it is apparent to us that neither term has such a well recognized single significance, either in law or as a matter of general language, as to preclude all doubt as to its meaning. Our task, therefore, has been to discover, if possible, in what sense the contracting parties used the terms—a task which has required an extensive examination into the historical background of the treaty.

In the years following the first World War the problem of international double taxation grew to serious proportions. Both the International Chamber of Commerce and the League of Nations became alarmed over the paralyzing effect of the problem on international trade, and each appointed committees for the purpose of formulating solutions and developing uniform principles. The committees of the two organizations cooperated. In 1927 the League of Nations Committee of Technical Experts on Double Taxation and Tax Evasion submitted a report of their studies and a model bilateral convention on double income taxation, based at least in part upon principles garnered from existing treaties between various European countries.[2] This model draft was thereupon sent by the League to the governments of various members and nonmember States, and in 1928 a meeting of government experts from 27 countries, including the United States and France, was convened at Geneva for the purpose of discussing the technical experts' recommendations and preparing other model texts. The meeting of government experts adopted, with some modifications, the draft recommended by the technical experts and in addition formulated two other model texts, designated as draft conventions

---

[1] 49 Stat. 3145, 3149.
[2] *Double Taxation and Tax Evasion*—Report Presented by the Committee of Technical Experts on Double Taxation and Tax Evasion, League of Nations Document, C. 216 M. 85. 1927. II. 40.

Nos. 1a, 1b, and 1c in their report.[3] As a result of the work of the League and the International Chamber of Commerce committees, "uniform definitions were being formulated, the predominant kinds of income were being classified, and an international tax language was being developed." [4]

Subsequent to the adoption of the draft conventions by the meeting of governments experts, a number of bilateral conventions embodying the provisions of the drafts were entered into between various European countries. France executed one double taxation treaty with Italy [5] on June 16, 1930, and another with Belgium [6] on May 16, 1931, in each of which provisions were made for the tax treatment of private pensions and life annuities. The present convention between the United States and France was the first bilateral treaty of its kind to which the United States was a party. Mitchell B. Carroll, who, while a special attorney in the Treasury Department, was sent by the State Department in 1930 to assist Ambassador Walter E. Edge in the negotiations of this treaty, reported that the League models afforded the framework for the treaty between the United States and France and that the treaty embodies the language and a number of the basic principals adopted at the Geneva meeting.[7]

With this background in mind, we turn to a consideration of the issue whether the payments here in controversey are "life annuities" within the meaning of the treaty. Did the contracting parties have in mind the contractual type of annuity, e. g., a purchased annuity, or should the term be held, as petitioner contends, to include a testamentary annuity? Article 9 of the League draft convention No. 1a and article 8 or draft convention No. 1c provide: [8]

---

[3] *Double Taxation and Tax Evasion.*—Report Presented by the General Meeting of Government Experts on Double Taxation and Tax Evasion, League of Nations Document, C. 562, M. 178. 1928. II.

[4] Mitchell B. Carroll, *The Development of International Tax Law; Franco-American Treaty on Double Taxation—Draft Convention on Allocation of Business Income.* (1935) 29 Am. J. Int. Law 586, 588. See also John G. Herndon, Jr., *Relief From International Income Taxation* (1932) 172 et seq. Professor Herndon was Secretary to the American Delegation of Government Experts on Double Taxation at the League Conference. See further Ke Chin Wang, *International Double Taxation of Income: Relief Through International Agreement,* 1921–1945 (1945) 59 Harv. L. Rev. 73 et seq.

[5] *Collection of International Agreements and Internal Legal Provisions for the Prevention of Double Taxation and Fiscal Evasion,* vol. III, p. 24, League of Nations Document, C. 585. M. 263. 1930. II.

[6] *Id.,* vol. V, p. 58, League of Nations Document, C. 618. M. 291. 1933. II. A.

[7] Mitchell B. Carroll, *supra,* note 3 at 588; M. B. Carroll, *The New Tax Convention Between The United States and Canada* (1942), 20 Taxes 459, 460. Mr. Carroll, in 1927, at that time Chief of the Tax Section, Foreign Laws Division, Dept. of Commerce, also assisted Dr. Thomas S. Adams, the American representative at the London session of the League Committee of Technical Experts; and he subsequently served as American member of the League's Fiscal Committee. See also E. M. McCaffery, *The Franco-American Convention Relative to Double Taxation* (1936), 36 Col. L. Rev. 382, 385.

[8] See note 3, *supra.*

Annuities or income from other sources not referred to in the previous paragraphs shall be taxable in the State of fiscal domicile of the creditor of such income.

The principle of taxing annuities at the domicile of the recipient was contrary to the principle of taxing certain other types of income, treated in other articles of the draft conventions, at the source or origin of the income. The official commentary on the above provision is that:

The exception which is thus made for annuities is justified by the special nature of this form of income, *since the recipient is free to select the country which is to be liable for the payment.* [Italics supplied.]

From this commentary it is evident to us that the problem with which the government experts were concerned was the taxation of the contractual type of annuity, for it is apparent that the recipient of a testamentary annuity, for example, would not be "free to select the country which is to be liable for the payment." Since the treaty we are considering was modeled on the League drafts, it is entirely reasonable to limit the term "life annuities" to purchased or contractual annuities. In two Internal Revenue Bureau rulings respondent has taken the position that the term "life annuities," for purposes of the convention, has reference only to the contractual annuity, that is, to "a stated sum payable periodically at stated times during life, or a specified number of years, under an obligation to make the payments in consideration of a gross sum paid for such obligation." See I. T. 3060, 1937–1 C. B. 113; G. C. M. 21187, 1939–1 C. B. (Part 1) 141.

It is observed, furthermore, that in the double taxation convention between this country and Sweden,[9] proclaimed December 12, 1939, effective January 1, 1940, and in that between this country and Canada,[10] proclaimed June 17, 1942, effective January 1, 1941, the term "life annuities" is expressly defined as contemplating only the contractual type of annuity. Also, in the second tax convention with France,[11] proclaimed January 5, 1945, effective January 1, 1945, paragraph IV of the protocol defines "life annuities" as follows:

The term "life annuities" referred to in article 8 of this convention means a stated sum payable periodically at stated times during life, or during a specified number of years to the person who has paid the premiums or a gross sum for such an obligation.

In view of the foregoing history, we think the above definition is not, as petitioner contends, evidence that in the first treaty the term "life annuities" had a scope sufficiently broad to include testamentary

[9] 54 Stat. 1759, 1764, 1776.
[10] 56 Stat. 1399, 1401, 1409.
[11] I. R. B. No. 8, Apr. 25, 1945, pp. 17, 19, 24.

annuities, and that in the second treaty the contracting parties were greatly narrowing the scope. On the contrary, it seems to us that although in the second instance the parties, for purposes of clarity, explicitly indicated the meaning to be ascribed to the term, nonetheless the contractual type of annuity, for example, the kind that might be purchased from an insurance company, was likewise contemplated in the first instance.

We come now to a consideration of the issue whether the payments to Germaine St. Laurent constituted a "private pension" within the meaning of the treaty. Webster's New International Dictionary (1939), 2d Ed., gives the following definitions of the term "pension":

A payment regularly made to any person; as * * * [to] one by way of subsidy or allowance, whether as a means of securing good will, co-operation, or the like, or as a gratuity, as to royal favorites or to men of eminence in art, literature, or science.

A stated allowance or stipend made by a government or business organization, in consideration of past services or of the surrender of rights or emoluments, to one retired from service; esp., a regular stipend paid by a government to retired public officers, disabled soldiers, the families of soldiers killed in service, etc.

Both public and private pensions were treated together in the League draft conventions. Article 8 of draft 1a and article 6 of draft 1c provide:[12] "Public or private pensions shall be taxable in the State of the debtor of such income."

At the Geneva meeting of the government experts in 1928, considerable conflict developed over this provision. The representatives of Great Britain and the United States opposed the principle of taxing such income, at least so far as private pensions were concerned, at the source or origin of the income. The minutes of the meeting throw considerable light upon what was contemplated in the use of the term "private pensions."[13] Throughout the debate on this subject repeated reference is made to pensions paid to employees of "companies," of "industrial undertakings," of "private enterprises," and of "private firms."

In the treaty between France and Italy,[14] executed June 16, 1930, the League principle of taxing private pensions in the State of the debtor, that is, the "party liable to pay them," was adopted. In the protocol to that convention it was provided that "As regards the taxation of private pensions * * * it is understood that, if the pension is paid by an *undertaking* which has *establishments* in both countries, the establishment responsible for making the payment shall be considered the party liable." (Italics supplied.)

[12] See note 3, *supra.*
[13] See John G. Herndon, Jr., op. cit., *supra,* note 4, at 211–216.
[14] See note 5, *supra.*

In the convention between the United States and Canada [15] no distinction is made between public and private pensions. Article VI of that treaty provides simply that:

Pensions and life annuities derived from within one of the contracting States and paid to individuals residing in the other contracting State shall be exempt from taxation in the former State.

And, the word "pensions" is defined in paragraph 8 of the protocol as "periodic payments made in consideration for services rendered or by way of compensation for injuries received."

While it would appear from the foregoing that the government experts at the Geneva meeting in 1928, in discussing private pensions, had in mind pensions paid to employees or former employees of business organizations and enterprises, nevertheless we are not disposed to hold, and it is unnecessary for us to hold, in this proceeding, that the term "private pensions" as used in the treaty with France is thus limited. This, because we would not feel warranted, on the basis of the present record, in concluding that the payments to Germaine St. Laurent could properly be characterized as a pension in any event. We have only the stipulated fact that this person had been in the employ of the decedent for a number of years prior to the decedent's death. The will itself contains no indication that the provision for her benefit was made in consideration for past services; it does not even indicate that an employer-employee relationship had existed between her and the decedent. The name of Germaine St. Laurent appears in the will. together with the names of a number of other persons, as but one of many beneficiaries of the testatrix's bounty. There is no evidence of any agreement between the two for the making of such a provision and no evidence as to whether it had been a practice on the part of the decedent to make retiring allowances for other employees, if indeed she had others. Furthermore, the incident which gave rise to the instant payments was the death of the decedent and not the occasion of the employee's disability or reaching an age proper for superannuation. The fact of the employment relationship seems to be purely a matter of coincidence. We think that Germaine St. Laurent was simply the beneficiary of a part of the income from a testamentary trust, and nothing more.

For the reasons stated, we hold that the payments in controversy were not "private pensions" or "life annuities" within the meaning of the tax convention with France, and that they are accordingly not exempt from withholding.

*Decision will be entered for the respondent.*

---

[15] See note 10, *supra.*