TEDD N. CROW, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 32439–83.    Filed August 26, 1985.

---

[7]See also *Baxter v. Commissioner*, T.C. Memo. 1985–415.

*Donald F. Wood*, for the petitioner.
*Sheri A. Wilcox*, for the respondent.

OPINION

COHEN, *Judge*: This case is before the Court on petitioner's motion for summary judgment under Rule 121, Tax Court Rules of Practice and Procedure. Respondent determined the following deficiencies in and additions to petitioner's Federal income taxes:

| Year | Deficiency | Sec. 6651(a)[1] | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6654 |
| --- | --- | --- | --- | --- | --- |
| | | | *Additions to tax* | | |
| 1978 | $1,657,734 | 0 | $82,899 | 0 | 0 |
| 1979 | 78,790 | $19,698 | 3,940 | 0 | $19,057 |
| 1980 | 156,410 | 39,103 | 7,821 | 0 | 9,986 |
| 1981 | 123,772 | 30,943 | 6,189 | ([1]) | 9,561 |
| 1982 | 71,414 | 17,854 | 3,571 | ([1]) | 6,953 |

[1]Amount to be computed upon assessment.

The issues for decision are as follows: (1) Whether the March 4, 1942, income tax treaty between the United States and Canada (Convention on Double Taxation, Mar. 4, 1942, United States-Canada, 56 Stat. 1399, T.S. No. 983, hereinafter referred to as the Canadian treaty) precludes the United States from taxing petitioner's capital gain income under section 877; and (2) if so, whether all of the income realized by petitioner in connection with the transactions described below is exempt from U.S. taxation under the Canadian treaty.

Petitioner and respondent have either agreed to as true, or conceded solely for the purpose of our ruling on, petitioner's motion the following facts:

Prior to November 1978, petitioner was a citizen and a resident of the United States. Petitioner moved to Canada on November 20, 1978, and renounced his U.S. citizenship on November 24, 1978. After the latter date, petitioner was a nonresident alien of the United States without a permanent establishment in the United States. The avoidance of United

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

States taxes was a principal purpose of petitioner's expatriation.

When petitioner moved to Canada, he owned all of the outstanding stock of a certain U.S. corporation. On December 1, 1978, petitioner sold his entire stock interest in exchange for a $6,366,000 note payable over a 20-year period and providing for no interest charges as long as payments on the note were timely made.

Petitioner did not report any income on any U.S. tax return with respect to the above transactions. Respondent determined that petitioner was taxable by the United States on long-term capital gain income in 1978 and on imputed interest income (under section 483) in the remaining years in issue.

*Issue 1. Capital Gain*

Article VIII of the Canadian treaty provides:

Gains derived in one of the contracting States from the sale or exchange of capital assets by a resident or a corporation or other entity of the other contracting State shall be exempt from taxation in the former State, provided such resident or corporation or other entity has no permanent establishment in the former State.

Petitioner contends that, under article VIII, he is exempt from U.S. tax on the gain realized upon the sale of the stock.

Respondent argues that petitioner is taxable on the gain under section 877, which imposes a special tax on a nonresident alien who relinquished his U.S. citizenship to avoid taxes.[2] According to respondent, the "saving clause" contained

---

[2] As in effect in 1982, sec. 877 provides, in relevant part:

SEC. 877. EXPATRIATION TO AVOID TAX.

(a) IN GENERAL.—Every nonresident alien individual who at any time after March 8, 1965, and within the 10-year period immediately preceding the close of the taxable year lost United States citizenship, unless such loss did not have for one of its principal purposes the avoidance of taxes under this subtitle or subtitle B, shall be taxable for such taxable year in the manner provided in subsection (b) if the tax imposed pursuant to such subsection exceeds the tax which, without regard to this section, is imposed pursuant to section 871.

(b) ALTERNATIVE TAX.—A nonresident alien individual described in subsection (a) shall be taxable for the taxable year as provided in section 1, 55, or 402(e)(1), except that—

(1) the gross income shall include only the gross income described in section 872(a) (as modified by subsection (c) of this section), and

(2) the deductions shall be allowed if and to the extent that they are connected with the gross income included under this section, except that the capital loss carryover provided by section 1212(b) shall not be allowed; and the proper allocation and apportionment of the deductions for this purpose shall be determined as provided under regulations prescribed by the Secretary.

in article XVII of the Canadian treaty reserves the right of the United States to tax petitioner under section 877 notwithstanding article VIII. Article XVII provides:

Notwithstanding any other provision of this Convention, the United States of America in determining the income and excess profit taxes, including all surtaxes, of its citizens or residents or corporations, may include in the basis upon which such taxes are imposed all items of income (other than income within the scope of paragraph 1 (b) of Article VI) taxable under the revenue laws of the United States of America as though this convention had not come into effect.[3]

Respondent does not argue that petitioner was a citizen or a resident of the United States when he realized the income in issue. Instead, respondent's position is that taken in Rev. Rul. 79–152, 1979–1 C.B. 237, which presented a situation almost identical to the present case:

Although the treaty contains a * * * [provision] regarding United States taxation of capital gains, such provision is subject to the treaty "saving clause" reserving the right of the United States to tax its citizens as though the treaty had not come into effect. This aspect of the saving clause is intended to preserve, with certain specific exceptions, United States taxation on the basis of citizenship, notwithstanding the limitations on United States taxation otherwise imposed by the treaty. Taxation under section 877 is a manifestation of United States taxation on the basis of citizenship; in effect, the section imposes income tax liability, by reason of citizenship, for ten years following a tax motivated expatriation. Consequently, the income tax treaty does not exempt from United States taxation taxpayer's capital gain * * * because by virtue of section 877 the taxpayer remains subject to tax as a United States citizen within the meaning of the treaty "saving clause." [Rev. Rul. 79–152, *supra*, 1979–1 C.B. at 237–238.]

* * * * * * *

(c) SPECIAL RULES OF SOURCE.—For purposes of subsection (b), the following items of gross income shall be treated as income from sources within the United States:

* * * * * * *

(2) STOCK OR DEBT OBLIGATIONS.—Gains on the sale or exchange of stock issued by a domestic corporation * * *

Minor amendments, not relevant herein, were made to sec. 877 during the years in issue. See Technical Corrections Act of 1979, Pub. L. 96–222, sec. 104(a)(1), (4)(H)(v), 94 Stat. 194, 214, 217; Revenue Act of 1978, Pub. L. 95–600, sec. 431(e)(5), 92 Stat. 2763, 2876.

[3] A supplementary convention signed in 1950 added the parenthetical language to art. XVII. See Supplementary Convention on Double Taxation, June 12, 1950, United States-Canada, art. I(m), 2 U.S.T. 2235, T.I.A.S. No. 2347. This language is not relevant herein.

Respondent thus interprets the term "citizens" in article XVII of the Canadian treaty to include former citizens who expatriated to avoid tax.

The goal of treaty interpretation is "to give the specific words * * * a meaning consistent with the genuine shared expectations of the contracting parties." *Maximov v. United States*, 299 F.2d 565, 568 (2d Cir. 1962), affd. 373 U.S. 49 (1963). We must examine not only the literal language of article XVII but also its purpose, history, and context. See *Kolovrat v. Oregon*, 366 U.S. 187 (1961); *Cook v. United States*, 288 U.S. 102 (1933); *Sullivan v. Kidd*, 254 U.S. 433 (1921).

Our examination reveals that the contracting parties had no intention to define the term "citizens" in article XVII more broadly than its literal meaning. As stated in Rev. Rul. 79–152, respondent justifies a nonliteral definition of "citizens" as reflecting the reservation in the saving clause of the right of the United States to tax on the basis of citizenship. Article XVII of the Canadian treaty, however, was intended only to preserve U.S. taxation *of citizens* on the basis of citizenship.

The United States was historically, and continues to be, virtually unique in taxing its citizens, wherever resident, on their worldwide income, solely by reason of their citizenship. See *Filler v. Commissioner*, 74 T.C. 406, 410 (1980), 3 R. Rhodes & M. Langer, Income Taxation of Foreign Related Transactions, sec. 9.06[1][b] (1984); Hitch, "Tax-Motivated Expatriation," 39 N.Y.U. Inst. Fed. Taxation 34–1, 34–3 (1981). The United States, therefore, traditionally insisted upon maintaining the ability to tax its citizens resident in the treaty partner, as manifested by the saving clause contained in the first income tax treaty with Canada: "The provisions of this Convention shall not apply to citizens of the United States of America domiciled or resident in Canada." Convention on Income Taxation, Dec. 30, 1936, United States-Canada, art. II, 50 Stat. 1399, T.S. No. 920 (terminated Apr. 30, 1941). See generally *Filler v. Commissioner*, 74 T.C. at 410; *Crerar v. Commissioner*, 26 T.C. 702, 705–706 (1956); Department of Treasury, Technical Explanation of the United States and United Kingdom Income Tax Treaty 2 (published as Treasury Department Press Release B-90 on Mar. 9, 1977) ("The saving clause is of principal importance to the United States because the United States taxes its citizens, residents, and corporations

on a worldwide basis, regardless of where they reside or derive income."); Bischel, "Basic Income Tax Treaty Structures," Income Tax Treaties 1, 11 (1978).

Interpretative documents published contemporaneously with the 1942 Canadian treaty indicate that the purpose of article XVII was to continue this reservation by the United States. "Article XVII makes clear that the convention leaves undisturbed the taxation by the United States of its own citizens and corporations." Letter from Acting Secretary of State Welles to President Roosevelt (Mar. 6, 1942).

The convention makes no change in the United States tax liability of American citizens and residents and domestic corporations. Under the Federal income-tax laws, such taxpayers are taxable upon their income from all sources whether derived from within or without the United States. * * * [S. Exec. Rept. 3, 77th Cong., 2d Sess. 1 (1942).]

"The convention does not, except as provided in the first paragraph of article VI, affect the liability * * * of a citizen of the United States residing in Canada." Reg. sec. 7.21, 1943 C.B. 534.[4] As the Supreme Court stated in *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961), "While courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight."

We have found no indication whatsoever that the contracting parties intended, or even contemplated, the application of article XVII to nonresident aliens of the United States. Indeed, the contemporaneous regulations issued by the Treasury Department implicitly rejected such an application of the saving clause. In describing the second paragraph of article XV, in which the United States agreed to allow a credit against U.S. income and excess profits taxes for such taxes paid to Canada,[5] the regulations provided:

---

[4] Reg. sec. 7.21 is now codified at 26 C.F.R. sec. 519.102(c) (1980). See 25 Fed. Reg. 14,021, 14,022 (1960).

The regulations were issued pursuant to art. XVIII of the Canadian treaty (see 1943 C.B. 533), which provides in part:

"The competent authorities of the two contracting States may prescribe regulations to carry into effect the present Convention within the respective States and rules with respect to the exchange of information."

[5] Art. XV provides in full:

1. As far as may be in accordance with the provisions of The Income Tax Act, Canada agrees to allow as a deduction from the Dominion income and excess profits taxes on any income which was

Credit Against United States Tax Liability for Income Tax Paid to Canada.—For the purpose of avoidance of double taxation, Article XV provides that, on the part of the United States, there shall be allowed against the United States income and excess profits tax liability a credit for any such taxes paid to Canada by United States citizens or domestic corporations. Such principle also applies in the case of a citizen of Canada residing in the United States. Such credit, however, is subject to the limitations provided in section 131, Internal Revenue Code (relating to the credit for foreign taxes). See sections 19.131–1 to 19.131–8, Regulations 103. *The article is complementary to the provisions of Article XVII*, which provides that the United States in ascertaining the income and excess profits tax of its citizens and residents and corporations may take into the basis upon which such taxes are imposed all items of income as though the convention had not come into effect. [Reg. sec. 7.35, 1943 C.B. 541. Emphasis supplied.][6]

Section 131 of the 1939 Code, effective when the above regulation was issued, provided no credit for nonresident aliens.

Respondent argues that Canada has no reason to object to his interpretation of the saving clause because "It is implausible to believe another nation has any significant interest in negotiating benefits for United States citizens who might one day expatriate with a principal purpose of avoiding United States taxes and reside in their country." In the first paragraph of article XV, however, Canada agreed to allow its taxpayers a credit to reflect taxes paid to the United States on U.S. source income. Because an American expatriate in Canada might be entitled to a higher Canadian tax credit

---

derived from sources within the United States of America and was there taxed, the appropriate amount of such taxes paid to the United States of America.

2. As far as may be in accordance with the provisions of the United States Internal Revenue Code, the United States of America agrees to allow as a deduction from the income and excess profits taxes imposed by the United States of America the appropriate amount of such taxes paid to Canada.

Prior to the supplementary convention signed in 1950, art. XV provided as follows:

In accordance with the provisions of Section 8 of the Income War Tax Act as in effect on the day of the entry into force of this Convention, Canada agrees to allow as a deduction from the Dominion income and excess profits taxes on any income which was derived from sources within the United States of America and was there taxed, the appropriate amount of such taxes paid to the United States of America.

In accordance with the provisions of Section 131 of the United States Internal Revenue Code as in effect on the day of the entry into force of this Convention, the United States of America agrees to allow as a deduction from the income and excess profits taxes imposed by the United States of America the appropriate amount of such taxes paid to Canada.

See Supplementary Convention on Double Taxation, June 12, 1950, United States-Canada, art. I(1), 2 U.S.T. 2235, T.I.A.S. No. 2347.

[6]Reg. sec. 7.35 is now codified at 26 C.F.R. sec. 519.116 (1980). See 25 Fed. Reg. 14,021, 14,022 (1960).

where section 877 applies,[7] Canada indeed possesses a fiscal interest in the applicability of the provision. Moreover, even if Canada has no interest in encouraging expatriation from the United States, Canada could reasonably object to the scope of section 877, which would deny treaty benefits for 10 years to expatriate Americans who acquired Canadian citizenship and residency. Finally, under respondent's interpretation of the term "citizens," the United States could, *without violating the Canadian treaty*, enact legislation significantly more burdensome to Canadian interests than is section 877.

In light of the purpose behind the saving clause, the absence of any indication that Canada anticipated respondent's interpretation with respect to the 1942 treaty, and the potential objections of Canada thereto, we find no support for respondent's expansive reading of article XVII.

it is particularly inappropriate for a court to sanction a deviation from the clear import of a solemn treaty between this Nation and a foreign sovereign, when, as here, there is no indication that application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories. * * * [*Maximov v. United States*, 373 U.S. 49, 54 (1963).]

See also *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176 (1982); *Rust v. Commissioner*, 85 T.C. 284 (1985).

The Canadian treaty, like an act of Congress, is part of "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. See *Reid v. Covert*, 354 U.S. 1, 18 (1957) (Opinion of Justice Black) and cases cited therein. Although Congress can override a treaty provision by enacting a subsequent statute (see *Reid v. Covert, supra*, and cases cited therein), respondent does not argue that Congress intended to overrule or supersede any provision of the Canadian treaty in enacting section 877 pursuant to the Foreign Investors Tax Act of 1966, Pub. L. 89–809, sec. 103(f), 80 Stat. 1539, 1551–1552 (hereinafter referred to as FITA). Such an argument would indeed be unpersuasive in light of section 110 of FITA, which provides:

SEC. 110. TREATY OBLIGATIONS.

No amendment made by this title shall apply in any case where its application would be contrary to any treaty obligation of the United States.

---

[7] Whether and the extent to which an increased United States tax liability resulting from the application of section 877 would increase the Canadian tax credit depend upon the amount of the expatriate's Canadian tax subject to the credit.

For purposes of the preceding sentence, the extension of a benefit provided by any amendment made by this title shall not be deemed to be contrary to a treaty obligation of the United States. [FITA, *supra*, 80 Stat. 1575.]

See also secs. 894(a) and 7852(d).

Respondent, instead, argues that we should construe the Canadian treaty and section 877 so as to give effect to both pronouncements. According to respondent, the purpose of section 877 is to prevent tax-motivated expatriation, and only his construction of the saving clause will effect this goal. We agree with respondent that we "must read the * * * [treaty and the statute] to give effect to each if we can do so while preserving their sense and purpose." *Watt v. Alaska*, 451 U.S. 259, 267 (1981). See also *United States v. Lee Yen Tai*, 185 U.S. 213, 221–222 (1902). Implicit in the above rule, however, is that "A canon of construction is not a license to disregard clear expressions of * * * congressional intent." *Andrus v. Glover Construction Co.*, 446 U.S. 608, 619 (1980) (quoting DeCoteau v. District County Court, 420 U.S. 425, 447 (1975)).

We note initially that respondent's interpretation is inconsistent with the literal language of section 877, which imposes a tax on a "nonresident alien individual." Sec. 877(a) and (b). Such a taxpayer could not be a citizen of the United States. Sec. 1.871–2(a), Income Tax Regs.

The history and purpose of FITA, in general, and section 877, in particular, confirm that Congress rejected the interpretation urged upon us by respondent. On October 2, 1963, President Kennedy appointed a task force, chaired by Treasury Secretary Fowler, to propose methods of promoting increased foreign investment in securities of U.S. companies and increased foreign financing for U.S. businesses operating abroad. Report to the President of the United States from the Task Force on Promoting Increased Foreign Investment and Increased Foreign Financing iii, v (Apr. 27, 1964). The task force concluded that many of the then-existing tax rules applicable to foreign investors in the United States were outmoded and deterred foreign investment in the United States. Based upon the conclusions of the task force, the Treasury Department submitted proposed legislation to Congress on March 8, 1965. Hearings on H.R. 5916 Before the House Comm. on Ways and Means, 89th Cong., 1st Sess. 25 (1965) (Statement of Secretary Fowler) (hereinafter cited as

House Hearings). On that date, Chairman Mills of the Ways and Means Committee introduced H.R. 5916, a bill designed to carry out the recommendations of the Treasury Department. 111 Cong. Rec. 4393 (1965); H. Rept. 1450, 89th Cong., 2d Sess. (1966), 1966–2 C.B. 967, 970.

Whereas the primary objective of the initial Treasury Department proposal was to stimulate foreign investment in the United States, the Ways and Means Committee broadened the scope of the bill to include equalizing the tax treatment accorded such investment. H. Rept. 1450, *supra*, 1966–2 C.B. at 970. Chairman Mills thus introduced a revised version of the bill as H.R. 11297 on September 28, 1965, and a further revision as H.R. 13103 on February 28, 1966. 111 Cong. Rec. 25,411 (1965); 112 Cong. Rec. 4229 (1966). The Senate ultimately adopted H.R. 13103 after minor amendments (see S. Rept. 1707, 89th Cong., 2d Sess. (1966), 1966–2 C.B. 1059, 1064), and the bill was signed into law (as FITA) by the President on November 13, 1966.[8]

The provisions in FITA for the taxation under the Internal Revenue Code of nonresident alien individuals were substantially the same as those provisions in H.R. 5916. Compare FITA, sec. 103, 80 Stat. 1547–1555 with H.R. 5916, 89th Cong., 1st Sess., sec. 3 (1965). Prior to the enactment of FITA, the Code prescribed complex rules for the taxation of U.S. source investment income realized by nonresident aliens. Nonresident aliens engaged in a trade or business in the United States were taxed on all U.S. source income at regular, graduated rates. A nonresident alien individual not engaged in a trade or business in the United States generally was taxed on certain U.S. source investment income at a flat 30-percent rate, if the individual realized not greater than $21,200 of such income. If such alien realized more than $21,200 of such income, however, he was taxed at regular graduated rates or at the 30-percent rate, whichever resulted in greater tax liability. Both Congress and the Treasury believed that the above system was arbitrary and unnecessarily complicated and that uniform taxation at the 30-percent rate of nonbusiness income realized

---

[8]The Senate added tits. II through IV to Pub. L. 89–809, secs. 201–402, 80 Stat. 1575–1590 (1966), prescribing miscellaneous provisions unrelated to FITA.

by nonresident aliens would encourage foreign investment in the United States. The solution initially proposed by the Treasury and ultimately adopted by Congress generally was to tax at regular graduated rates only the income of nonresident aliens that is attributable to a trade or business in the United States. Most U.S. source investment income not so attributable would be subject to the 30-percent tax, regardless of the amount of such income and regardless of whether the individual maintained a trade or business in the United States. H. Rept. 1450, *supra*, 1966–2 C.B. at 978–980; S. Rept. 1707, *supra*, 1966–2 C.B. at 1074–1076; Department of Treasury, Explanation of H.R. 5916, reprinted in House Hearings, *supra* at 16–17. FITA thus codified in section 871 the now-familiar concept of income "effectively connected" with the conduct of a U.S. trade or business. FITA, sec. 103(a), 80 Stat. 1457–1458.

Congress and the Treasury shared the concern, however, that the elimination of progressive taxation with respect to nonbusiness income realized by nonresident aliens might encourage some individuals to renounce their U.S. citizenship and move abroad. See H. Rept. 1450, *supra*, 1966–2 C.B. at 982–983; S. Rept. 1707, *supra*, 1966–2 C.B. at 1078–1079; Department of Treasury, Explanation of H.R. 5916, *reprinted in* House Hearings, *supra* at 20–21. See also *Kronenberg v. Commissioner*, 64 T.C. 428 (1975). To prevent this potential abuse, Congress codified section 877, the provision here in issue, under sec. 103(f) of FITA.[9] Section 877 is virtually identical, in both operative scope and language, to the Treasury Department's initial proposal embodied in section 3(d) of H.R. 5916. Indeed, the Senate restored the 10-year period of applicability for section 877, after the House had shortened the period proposed by the Treasury Department to 5 years. See 112 Cong. Rec. 26,386 (1966); Hearings on H.R. 13130 Before the Senate Comm. on Finance, 89th Cong., 2d Sess. 54 (1966). Compare FITA, sec. 103(f), 80 Stat. 1551 and H.R. 5916, 89th Cong., 1st Sess., sec. 3(d) (1965), with H.R. 13103, 89th Cong., 2d Sess. sec. 3(e) (1966).

Respondent is thus generally correct in asserting that the purpose behind section 877 is to prevent tax-motivated expatriation. As respondent notes, the Treasury Department ex-

---

[9] FITA also added analogous provisions in the estate and gift tax areas, codified at secs. 2107 and 2501(a), respectively. See FITA, secs. 108(f), 109(a), 80 Stat. 1573–1575.

pressed this purpose in its explanation of H.R. 5916, which Chairman Mills introduced into the Congressional Record:

As a result of the proposed elimination of graduated rates, * * * an American citizen who gives up his citizenship and moves to a foreign country would be able to very substantially reduce his U.S. * * * income tax liabilit[y].

While it may be doubted that there are many U.S. citizens who would be willing to give up their U.S. citizenship no matter how substantial the tax incentive, a tax incentive so great might lead some Americans to surrender their citizenship for the ultimate benefit of their families. Thus, it seems desirable, if progressive rates are eliminated for nonresident aliens, * * * that steps be taken to limit the tax advantages of alienage for our citizens.

The recommended legislation accomplishes this by providing that a nonresident alien who surrendered his U.S. citizenship within the preceding 10 years shall remain subject to tax at regular U.S. rates on all income derived from U.S. sources. * * *

[111 Cong. Rec. 4372 (1965).]

In relying upon the above language, however, respondent neglects an important qualification placed upon the general purpose of section 877. As the Treasury explanation continued only two paragraphs later, "Th[is] provision * * * would not apply if contravened by the provisions of a tax convention with a foreign country." The explanation merely made explicit the implicit—that under section 110 of FITA, section 877, like all FITA provisions, does not apply where its application would be inconsistent with a treaty.

Moreover, as the Ways and Means Committee report on H.R. 13103 makes clear, section 110 of FITA applies to treaties in force on the date of enactment:

Section 10 of the bill [section 110 of FITA] provides that, if the application of any provision of the bill would be contrary to a treaty obligation of the United States *in force on the date of enactment of the bill*, the treaty obligation is to prevail. [H. Rept. 1450, *supra*, 1966–2 C.B. at 1052. Emphasis supplied.]

Among all the income tax treaties in force on the date of enactment of FITA that we have reviewed, we have not found a single treaty in which the conflict with section 877 was more direct than the conflict between section 877 and article VIII of the Canadian treaty.[10] Each of the other treaties either

---

[10]See Convention on Double Taxation, Oct. 25, 1956, United States-Austria, 8 U.S.T. 1699, T.I.A.S. No. 3923; Convention on Double Taxation, Oct. 28, 1948, United States-Belgium, 4 U.S.T.

contained a saving clause similar to article XVII or, less frequently, defined resident of the treaty partner so as to preserve the right of the United States to tax its citizens. None of the treaties contained specific language precluding the application of section 877 or a like statute. Thus section 110 would have no purpose with respect to section 877 if it did not prevent the application of section 877 in the present case.[11]

Respondent argues that section 110 of FITA is only precautionary and was not intended as a response to an identified conflict between section 877 and any treaty. Respondent's argument necessarily implies, however, that Congress intended section 877 to apply in the face of *all* treaties in force as of the enactment of FITA. In light of the general applicability of section 110 and the contemporaneous Treasury explanation, had Congress intended such, it would have so indicated. Any doubt that we should reject respondent's implausible assertion of congressional intent is resolved by the following statement of Assistant Treasury Secretary Surrey:

---

1647, T.I.A.S. No. 2833; Convention on Double Taxation, May 6, 1948, United States-Denmark, 62 Stat. 1730, T.I.A.S. No. 1854; Convention on Double Taxation, Mar. 3, 1952, United States-Finland, 3 U.S.T. 4485, T.I.A.S. No. 2596; Convention on Double Taxation, Oct. 18, 1946, United States-France, 64 Stat. (3) B3, T.I.A.S. No. 1982; Convention on Double Taxation, July 22, 1954, United States-Germany, 5 U.S.T. 2768, T.I.A.S. No. 3133; Convention on Double Taxation, Feb. 20, 1950, United States-Greece, 5 U.S.T. 47, T.I.A.S. No. 2902; Convention on Double Taxation, Sept. 13, 1949, United States-Ireland, 2 U.S.T. 2303, T.I.A.S. No. 2356; Convention on Double Taxation, Mar. 30, 1955, United States-Italy, 7 U.S.T. 2999, T.I.A.S. No. 3679; Convention on Double Taxation, Apr. 16, 1954, United States-Japan, 6 U.S.T. 149, T.I.A.S. No. 3176; Convention on Income and Property Taxes, Dec. 18, 1962, United States-Luxembourg, 15 U.S.T. 2355, T.I.A.S. No. 5726; Convention on Double Taxation, Apr. 29, 1948, United States-the Netherlands, 62 Stat. 1757, T.I.A.S. No. 1855; Convention on Double Taxation, June 13, 1949, United States-Norway, 2 U.S.T. 2323, T.I.A.S. No. 2357; Convention on Double Taxation, July 1, 1957, United States-Pakistan, 10 U.S.T. 984, T.I.A.S. No. 4232; Convention on Double Taxation, Nov. 14, 1939, United States-Sweden, 54 Stat. 1759, T.S. No. 958; Convention on Double Taxation, May 24, 1951, United States-Switzerland, 2 U.S.T. 1751, T.I.A.S. No. 2316; Convention on Double Taxation, Dec. 13, 1946, United States-South Africa, 3 U.S.T. 3821, T.I.A.S. No. 2510; Convention on Double Taxation, Apr. 16, 1945, United States-United Kingdom, 60 Stat. 1377, T.I.A.S. No. 1546.

[11]This conclusion is consistent with the uniform opinion of the commentators who have addressed the issue. See 1 R. Rhoades & M. Langer, Income Taxation of Foreign Related Transactions sec. 2.24[1] (1984); Hitch, "Tax-Motivated Expatriation," 39 N.Y.U. Inst. Fed. Taxation 34-1, 34-28—34-30 (1981); Roberts, "Is Revenue Ruling 79-152, which taxes an expatriate's gain, consistent with the Code?" 51 J. Taxation 204 (1979). See also Bissell, "The Treasury's Model Income Tax Treaty: An Analysis and Appraisal," 3 Int. Tax J. 8, 9 (1976); Langer, "The Need for Reform in the Treaty Area," in Income Tax Treaties 717, 746-748 (Bischel ed. 1978); Ness, "Federal Tax Treatment of Expatriates Entitled to Treaty Protection," 21 Tax Law. 393, 398-399 (1968); Ross, "United States Taxation of Aliens and Foreign Corporations: The Foreign Investors Tax Act of 1966 and Related Developments," 22 Tax L. Rev. 277, 347 (1967); Comment, "Internal Revenue Code Section 877: Expanded Purview Generates Discord in Taxation of the Tax-Motivated Expatriate," 13 Cal. West. Int. L. J. 58 (1983).

The abandonment of the application of the progressive income tax rates to foreign individuals investing in the United States, the cut-back of other income tax provisions, and the reduction of estate tax rates would establish a distinctly brighter tax picture in the United States for the foreigner. Indeed, the picture is such that Americans may be tempted to become "foreigners" for tax reasons. * * * But to the extent possible we should not permit our tax problems with Americans to act as a bar to rational revisions in our treatment of foreigners. The proposed bill [H.R. 11297] meets this objective by keeping American expatriates still subject to full United States tax on their United States income and assets, for five years after loss of citizenship in the case of the income tax and for ten years in the case of the estate tax, where the loss of citizenship is motivated by the desire to avoid our taxes. *Where such a result is contrary, however, to a tax treaty, the treaty would govern. But since our tax treaties are largely with countries whose tax systems involve rates at significant levels, an expatriate who establishes residence in those countries is not likely to be motivated by a desire to avoid United States taxes.* [Remarks by Stanley S. Surrey, Assistant Secretary of the Treasury, at the Tax Institute of America Symposium (Dec. 2, 1965) 46–47 (published as Treasury Department Press Release F–291, on Dec. 3, 1965). Emphasis supplied.]

Respondent urges us to give deference to "the view of the Treasury Department" expressed in Rev. Rul. 79–152. A revenue ruling represents the view of the Commissioner, not the Treasury Department (*Browne v. Commissioner*, 73 T.C. 723, 731 (1980) (Hall, J., concurring)), and thus is generally only "the contention of one of the parties to the litigation." *Estate of Smead v. Commissioner*, 78 T.C. 43, 47 n. 5 (1982). See *Stubbs, Overbeck & Associates, Inc. v. United States*, 445 F.2d 1142, 1146–1147 (5th Cir. 1971); *Estate of Lang v. Commissioner*, 64 T.C. 404, 406–407 (1975), affd. on this issue 613 F.2d 770, 776 (9th Cir. 1980). Because Rev. Rul. 79–152 does not constitute a consistent and long-standing administrative position with prior congressional or judicial approval, it is not entitled to any special deference in this Court. Cf. *United States v. Correll*, 389 U.S. 299 (1967); *Commissioner v. Stidger*, 386 U.S. 287 (1967).

Even if we attributed greater authority to Rev. Rul. 79–152 than that normally due a revenue ruling, the present case would be governed by the holdings of the Supreme Court in *United States v. Vogel Fertilizer Co.*, 455 U.S. 16 (1982), and *Watt v. Alaska*, 451 U.S. 259 (1981). In both cases, the Supreme Court construed a statute that, like FITA, had been initially proposed and contemporaneously interpreted or applied by an agency that later reversed its position. The Supreme Court in

both cases adopted the contemporaneous interpretation or application. In *Vogel Fertilizer Co.*, the Court stated:

> The Treasury Department's explanations of the proposed statute are not, as the dissent in the Court of Claims suggested, a mere "admission against interest" by the Commissioner. 225 Ct. Cl. at 44, 634 F.2d at 514. The expanded definition of "brother-sister controlled group" was proposed by the Treasury Department and adopted in the same form in which it was presented. Of course, it is Congress' understanding of what it was enacting that ultimately controls. But we necessarily attach "great weight" to agency representations to Congress when the administrators "participated in drafting and directly made known their views to Congress in committee hearings." *Zuber v. Allen*, 396 U.S. 168, 192 (1969). * * * [455 U.S. at 31.]

Similarly, in *Watt* the Court concluded:

> the Department of the Interior interpreted the amendments when passed, and for 10 years thereafter, as not altering the distribution formula. The Department's contemporaneous construction carries persuasive weight. *Udall v. Tallman*, 380 U.S. at 16. Such attention to contemporaneous construction is particularly appropriate in these cases, because the Department first proposed the amendment. See *SEC v. Sloan*, 436 U.S. 103, 120 (1978). The Department's current interpretation, being in conflict with its initial position, is entitled to considerably less deference. See *General Electric Co. v. Gilbert*, 429 U.S. 125, 143 (1976). In these cases, we find it wholly unpersuasive. [451 U.S. at 272–273.]

Both petitioner and respondent attempt to support their respective positions based upon the current treaty policy of the United States to insist upon a saving clause specifically reserving its right to tax under section 877. This policy is exemplified by article 1(3) of the U.S. Model Income Tax Treaty[12] and the saving clauses contained in many recently negotiated treaties, including the treaty currently in effect with Canada.[13] Petitioner argues that the mere use of the

---

[12](3) Notwithstanding any provision of this Convention except paragraph (4) of this Article, a Contracting State may tax its residents (as determined under Article 4 (Fiscal Domicile)), and by reason of citizenship may tax its citizens, as if this Convention had not come into effect. For this purpose the term "citizen" shall include a former citizen whose loss of citizenship had as one of its principal purposes the avoidance of income tax, but only for a period of 10 years following such loss.

[13]The Convention on Taxes on Income and Capital, Sept. 26, 1980, United States-Canada, ____ U.S.T. ____, T.I.A.S. No. ____ (1 CCH Tax Treaties par. 1301), became effective and superseded the 1942 Canadian treaty on Aug. 16, 1984. Art. XXIX(2) of the new treaty provides:

2. Except as provided in paragraph 3, nothing in the Convention shall be construed as preventing a Contracting State from taxing its residents (as determined under Article IV (Residence)) and, in the case of the United States, its citizens (including a former citizens whose loss of citizenship had as one of its principal purposes the avoidance of tax, but only for a period of

more specific language implies that section 877 does not apply through a "general" saving clause like article XVII of the Canadian treaty. Respondent contends that the more specific saving clauses represent language clarifications and not substantive changes in the ability of the United States to tax expatriates.

After examining many recent treaties, we conclude that the current treaty practice of the United States sheds little light on the issue before us. The reports of the Senate Foreign Relations Committee and the Joint Committee on Taxation with respect to the new Canadian treaty are typical of the contemporaneous interpretations of "specific" saving clauses:

> Under Section 877, a former citizen whose loss of citizenship had as one of its principal purposes the avoidance of U.S. income tax, will, in certain cases, be subject to tax for a period of 10 years following the loss of citizenship. The proposed treaty contains the standard provision found in the U.S. model and most recent treaties specifically retaining the right to tax a former U.S. citizen whose loss of citizenship had as one of its principal purposes the avoidance of U.S. tax. This right to tax continues whether the former citizen had a principal purpose of avoiding income tax or some other tax. *Even absent a specific provision the IRS takes the position that the U.S. retains the right to tax former citizens resident in the treaty partner.* [S. Exec. Rept. 22, 98th Cong., 2d Sess. 47 (1984). Emphasis supplied.]

Accord, Staff of Joint Comm. on Taxation, Explanation of Proposed Income Tax Treaty (and Proposed Protocols) Between the United States and Canada 54 (Comm. Print 1984). The interpretations thus carefully identify respondent's position as his own and exhibit no intention to adopt such position.

Petitioner cites recent treaties containing traditional (i.e., "general") saving clauses in support of his position that the two types must possess different meanings. We note, however, that the treaty with Malta contains a general saving clause (Agreement on Income Taxes, Mar. 21, 1980, United States-Malta, art. 1(3), ____ U.S.T. ____, T.I.A.S. No. 10567 (1984–2 C.B. 339)), but the Senate Foreign Relations Committee and the Joint Committee on Taxation interpreted that clause in accordance with respondent's position:

---

ten years following such loss) and companies electing to be treated as domestic corporations, as if there were no convention between the United States and Canada with respect to taxes on income and on capital.

The treaty does not contain the standard provision found in the U.S. model, and most recent treaties, specifically retaining the right to tax former citizens. However, the article is intended to cover former citizens to reserve the right of the U.S. to tax former citizens under section 877. This is the position of the Internal Revenue Service. See Rev. Rul. 79–152, 1979–1 C.B. 237. [S. Exec. Rept. No. 30, 97th Cong., 1st Sess. 6 (1981), 1984–2 C.B. 353; Staff of Joint Comm. on Taxation, Explanation of Proposed Income Tax Treaty Between the United States and the Republic of Malta 9 (Comm. Print 1981).][14]

While these interpretations might initially appear to undermine petitioner's position herein, the Maltese treaty was signed after the promulgation of Rev. Rul. 79–152. During the negotiation of the treaty, Malta could have explicitly or implicitly consented to the application of section 877 despite the lack of a specific reservation in the saving clause.[15] Indeed, the explanations accompanying the treaty with Egypt (signed 5 months after the Maltese treaty, containing the traditional saving clause, and considered contemporaneously with the Maltese treaty by the Senate Foreign Relations Committee) do not indicate that the United States may apply section 877 through the saving clause. See S. Exec. Rept. 27, 97th Cong., 1st Sess. 12 (1981); Staff of Joint Comm. on Taxation, Explanation of Proposed Income Tax Treaty Between the United States and Egypt 14 (Comm. Print 1981). In any event, treaties coming into force after the enactment of FITA may have little relevance to the issue before us, as section 110 of FITA may not apply to such treaties. See H. Rept. 1450, *supra*, 1966–2 C.B. at 1052.

We thus conclude that the 1942 Canadian treaty, as agreed to by the contracting parties, does not allow the United States to tax former citizens under section 877. Although Congress could have provided otherwise by statute, Congress did not do

---

[14]The Treasury Department's explanation of the Maltese treaty would not suggest such a result:

"Paragraph (3) contains the traditional 'saving clause' under which each Contracting State reserves the right to tax its residents, as determined under Article 4 (Fiscal Residence), and its citizens as if the Treaty had not come into effect. [Department of Treasury, Technical Explanation of the Agreement Between the United States of America and the Republic of Malta with Respect to Taxes on Income 2 (Published in Treasury Department Press Release R–367 on Sept. 24, 1981), 1984–2 C.B. 366.]"

This interpretation is consistent with the typical interpretations accompanying recent treaties containing general savings clauses.

[15]Cf. Rosenbloom, "Current Developments in Regard to Tax Treaties," 40 N.Y.U. Inst. Fed. Taxation 31–1, 31–93 n. 247 (1982) (similar conclusion with respect to Jamaican treaty prior to protocol amendment).

so with the enactment of FITA. Respondent argues at length what Congress *could* have done instead of enacting section 877. He asserts, for example, that Congress could have prescribed a 10-year waiting period before loss of citizenship would be effective or placed conditions upon expatriation. The issue before us, however, is not what Congress could have done but what it did. See *Dillin v. Commissioner*, 56 T.C. 228, 240–241 (1971).

While the result reached in this case may seem undesirable on the assumed facts, we cannot let our policy preferences control our decision. Congress must weigh the potential for abuse against sound foreign policy considerations. Neither respondent through administrative action nor the Court through judicial interpretation can substitute its judgment for that of Congress in these matters.

## *Issue 2. Imputed Interest*

Petitioner argues that the entire difference between the face amount of the non-interest-bearing note and his basis in the stock exchanged therefor is exempt from U.S. taxation under article VIII of the Canadian treaty. Respondent contends that, even if section 877 is inapplicable to petitioner, petitioner is taxable on imputed interest income under section 483, although at the 15-percent rate prescribed in article XI(1).[16]

Where the Internal Revenue Code provides for the taxation of income, "Whatever basis there may be * * * for relieving the * * * tax must be found in the words or implications of the Convention." *Maximov v. United States*, 373 U.S. 49, 51 (1963). Cf. *Johansson v. United States*, 336 F.2d 809, 811 (5th Cir. 1964); *Di Portanova v. United States*, 690 F.2d 169, 177 (Ct. Cl. 1982); *Great-West Life Assur. Co. v. United States*, 678 F.2d 180, 181–182 (Ct. Cl. 1982); *Kimball v. Commissioner*, 6 T.C. 535 (1946).

Article XI(1) of the Canadian treaty provides:

1. The rate of income tax imposed by one of the contracting States, in respect of income (other than earned income) derived from sources therein, upon individuals residing in, or corporations organized under the laws of, the

---

[16]The parties apparently agree that the income in issue is from sources within the United States and would thus be taxable under sec. 871(a), absent the Canadian treaty.

other contracting State, and not having a permanent establishment in the former State, shall not exceed fifteen percent for each taxable year.

Petitioner first correctly notes that income subject to article XI(1) includes interest. He then argues that the term "interest," as defined by paragraph 6(b) of the protocol executed contemporaneously with the Canadian treaty, expressly excludes imputed interest. Therefore, he asserts, the amount that respondent treats as imputed interest must be part of his gain exempted from tax under article VIII.

Paragraph 6(b) of the protocol provides:

(b) the term "interest," as used in this Convention, *shall include* income arising from interest-bearing securities, public obligations, mortgages, hypothecs, corporate bonds, loans, deposits and current accounts. [Emphasis supplied.][17]

The protocol thus does not set forth an exclusive definition of "interest," nor does it expressly exclude imputed interest from the term.

More fundamentally, article XI(1) applies not only to interest but also to other types of unearned income. The regulations confirm this plain reading of article XI(1):

Under the terms of the convention, * * * the rate of tax * * * is reduced to 15 percent in the case of * * * [certain] individuals who are residents of Canada and in the case of * * * [certain] corporations organized under the laws of Canada, with respect to amounts received from sources within the United States as interest (except interest exempt from tax), dividends, rents, salaries, wages, premiums, compensations, remunerations, emoluments *or other fixed or determinable annual or periodical gains, profits and income,* other than annuities and pensions which are exempt from the tax under the convention. * * * [26 C.F.R. sec. 519.112 (1980). Emphasis supplied.][18]

Thus, even if paragraph 6(b) of the protocol excluded imputed interest from "interest," article XI(1) would nevertheless apply to imputed interest, like most other forms of unearned income.[19]

---

[17]Par. 6 of the protocol was initially numbered par. 7. See Supplementary Convention on Double Taxation, Aug. 8, 1956, United States-Canada, art. I(d), 8 U.S.T. 1619, T.I.A.S. No. 3916.

[18]Reg. sec. 519.112 was initially numbered sec. 7.31 (see 25 Fed. Reg. 14,021, 14,022 (1960)) and does not reflect the addition of the phrase "(other than earned income)" to art. XI(1) by the supplementary convention signed in 1956. See Supplementary Convention on Double Taxation, Aug. 8, 1956, United States-Canada, art. I(c), 8 U.S.T. 1619, T.I.A.S. No. 3916.

[19]The definition provided in par. 6(b) of the protocol is relevant for treaty provisions that refer specifically to "interest," such as art. XII.

Article VIII provides a specific exception from article XI(1) with respect to one type of unearned income—gain from the sale or exchange of capital assets. Yet, even if we assumed that imputed interest income is somehow outside the scope of article XI(1), we find no indication, in the text of the treaty or otherwise, that article VIII would apply to such income. Petitioner apparently belives that the inapplicability of article XI(1) automatically establishes the applicability of article VIII. We see no such connection between the two provisions. The logical conclusion from petitioner's premise that article XI(1) does not apply to imputed interest is instead that such income is taxable at the rates prescribed in the Code. See *Maximov v. United States*, 373 U.S. at 51.

Petitioner finally argues: "The difference in the treatment of imputed interest under the domestic laws of the United States and Canada dictates that before such interest can be taxed, the issue must be negotiated and addressed by specific treaty language." According to petitioner, only Canada and not the United States taxed imputed interest at the time the Canadian treaty came into effect, and the Canadian system provides for a subjective "facts and circumstances" analysis in contrast to the objective process of section 483. Petitioner further notes that paragraph 2 of the contemporaneous protocol and section 519.102(a) of the regulations provide, respectively, as follows:

2. In the event of appreciable changes in the fiscal laws of either of the contracting States, the Governments of the two contracting States will consult together.

   *  *  *  *  *  *  *

Sec. 519.102 Scope of secs. 519.101 to 519.120.—(a) The primary purposes of the convention, to be accomplished on a mutually reciprocal basis, * * * [include] the application of a limited rate of taxation to certain classes of income derived from within one of the contracting States by residents or corporations of the other contracting State * * *[20]

From all of this, petitioner deduces: "In order for this goal of mutuality to be effected, taxation by both countries must be implemented pursuant to the express terms of the Treaty, and cannot be changed by subsequent amendments of the internal

---

[20]See *supra* note 4.

laws of one of the countries unless such change is addressed through subsequent negotiations."

We need not respond in detail to every implication raised by the above argument but can dispose of the issue with a few simple principles. First and foremost, respondent's interpretation, not petitioner's, is the more faithful to the express terms of the Canadian treaty and to settled rules governing the relationship between treaties and the Internal Revenue Code. Second, even if Congress breached its duty under paragraph 2 of the protocol in enacting section 483,[21] Congress can abrogate a treaty provision by subsequent statute. See *Reid v. Covert*, 354 U.S. 1, 18 (1957) (Opinion of Justice Black), and cases cited therein. Third, paragraph 2 of the protocol only mandates that the Governments consult; a change in fiscal law does not affect the other provisions of the treaty.[22] Finally, the right of the United States to tax imputed interest at the reduced rate provided in article XI(1) is consistent with the mutuality objective expressed in section 519.102(a) of the regulations. Allowing both the United States and Canada to tax imputed interest, although under conceptually different domestic rules, does not undermine mutuality. The Canadian treaty by no means contemplates identical domestic tax systems. Cf. *Maximov v. United States*, 373 U.S. at 54.

## Conclusion

Petitioner's motion for summary judgment will be granted with respect to the first issue and will be denied with respect to the second issue. Because triable issues of fact remain,

*An appropriate order will be issued.*

---

[21]We make no finding concerning this issue but note that the addition of sec. 483 to the Code by the Revenue Act of 1964, Pub. L. 88–272, sec. 224, 78 Stat. 19, 77–79, could reasonably not be deemed an appreciable change in fiscal law.

[22]See *supra* note 21. This Court is, of course, powerless to enforce a provision such as par. 2. See *Filler v. Commissioner*, 74 T.C. 406 (1980).