CHARLES L. KNAPP AND BEVERLEY E. KNAPP,
PETITIONERS *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket No. 20277-83.          Filed March 15, 1988.

*Norman Sinrich, Nancy W. Pierce, George E. Zeitlin,* and
Lauren Kelly (specially recognized), for the petitioners.

*Elizabeth M. Fasciana* and Patrick W. Turner (specially
recognized), for the respondent.

PARR, *Judge:* Respondent determined a deficiency in petitioners' 1979 Federal income tax in the amount of $5,218.50, and an addition to their 1979 Federal income tax in the amount of $260.93 pursuant to section 6653(a).[1] After concessions, the issue for decision is whether Charles L. Knapp (petitioner) received taxable compensation from his employer, New York University School of Law (the law school), in the form of tuition payments made by the law school's Law Center Foundation (LCF) on behalf of petitioner's daughters directly to the educational institutions they attended. In support of their position that these tuition payments did not constitute taxable income, petitioners argue that (1) the tuition payments made by LCF to the other educational institutions were scholarships within the meaning of section 117; and (2) even if they were not scholarships under the statute, respondent was required to treat the tuition payments as scholarships pursuant to the "fringe benefit moratorium" enacted by Congress in 1978 (Pub. L. 95-427, as extended).

---

[1] All section references are to the Internal Revenue Code of 1954 as in effect during the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and related exhibits are incorporated herein by this reference.

Petitioners, husband and wife, resided in New York, N.Y., at the time they filed the petition in this case. Their joint Federal income tax return for 1979 was timely filed with the Internal Revenue Service Center in Holtsville, N.Y.

Petitioner is a full-time faculty member of New York University School of Law. Petitioner began his employment at the law school in 1964. In 1979, his rank was professor of law (with permanent tenure) and associate dean.

No negotiated employment contract existed between petitioner and the law school. Prior to each academic year, he received a letter informing him of his rank and salary for the coming year. Petitioner's compensation for the 1978-79 academic year was $49,200, and for 1979-80 was $52,650.

The law school is part of New York University (NYU), an educational institution described in section 170(b)(1)(A)(ii) which is exempt from taxation under section 501(c)(3), and was so in 1979.

The Law Center Foundation, also part of NYU, is a section 501(c)(3) exempt organization which is also a section 509(a)(3) organization, and was so in 1979. LCF operates solely for the benefit of and in connection with NYU. It is not a private foundation for tax purposes.

In 1976, NYU adopted a statement of policy wherein LCF would provide tuition assistance to the children of faculty members of the law school. The program began in 1977.[2] In 1979, all children of full-time faculty members and of administrators of the law school with the titles of director, assistant dean, or associate dean were eligible to receive these tuition assistance awards. To apply for the award, the child had to be enrolled in a private elementary or secondary school, or college. In addition, under certain circumstances, the children of faculty members who were on leave of absence to teach at another school, or on unpaid leave for

---

[2]This LCF tuition assistance program was a continuation of a program previously administered by the C.F. Mueller Scholarship Foundation. LCF adopted the program after NYU sold the C.F. Mueller Co.

public interest work or Government service, could also be eligible for LCF tuition assistance.

During the fiscal year ended August 31, 1979, LCF awarded tuition assistance in the amount of $155,667. During the fiscal year ended August 31, 1980, such awards totaled $197,857. The children of approximately one-third of all full-time faculty members and top-level administrators received these awards.

The availability of tuition assistance for dependents was viewed as a benefit available to faculty and administrators, and was a way to compete with other area law schools in attracting faculty to NYU. Faculty members and administrators who did not have children receiving tuition assistance did not receive any additional remuneration in lieu of such award, and those whose children did receive tuition awards did not have their salaries adjusted or their responsibilities increased to reflect that fact. Salaries were based on rank and, to some extent, age and number of years out of law school. The number of children in the family was not a factor in determining salary.

The LCF tuition assistance awards were paid directly to the educational institution attended by the faculty member's child, on his or her behalf. The awards were made on an academic year basis, but the payments sent on a semester or quarterly basis. The awards were for tuition alone, not room and board or fees. The amount of the award could not exceed the amount of tuition charged by the school, less any other tuition assistance the child was receiving.

In order to receive the award, the child was required only to submit a one-page application to LCF. The LCF scholarship committee did not consider the child's academic record, the school he or she was attending, or the family's financial resources. Awards were automatic as long as the child met the eligibility requirements. The amount of tuition awarded was determined without regard to the tenure or rate of compensation of the parent.

Petitioner's daughters, Jennifer and Liza, received LCF tuition awards in 1979. The payments were made directly to Swarthmore College (Swarthmore) on behalf of Jennifer, and the Brearley School (Brearley), on behalf of Liza, as follows:

| Date | School | Amount |
|------|--------|--------|
| 1/04/79 | Swarthmore | $2,200 |
| 1/04/79 | Brearley | 1,420 |
| 8/14/79 | Swarthmore | 2,350 |
| 8/14/79 | Brearley | 2,280 |
| Total | | 8,250 |

Both Swarthmore and Brearley are educational institutions described in section 170(b)(1)(A)(ii), and were so in 1979. Jennifer and Liza were both candidates for a degree at their respective schools in 1979, within the meaning of section 117(b). Neither of them rendered any services to NYU in exchange for the tuition assistance awards.

In 1979, neither Swarthmore nor Brearley maintained any tuition plan or arrangement with the law school whereby one school would waive the tuition charges for a child of the other school's faculty.

On their 1979 tax return, petitioners did not report as income the $8,250 paid on behalf of their daughters. Jennifer and Liza also did not report these tuition awards as income. Respondent issued a notice of deficiency to petitioners, determining that the $8,250 was additional compensation to petitioner.

OPINION

Petitioners first contend that the LCF tuition assistance awards are excludable from gross income as scholarships under section 117(a) and section 1.117-3(a), Income Tax Regs.

Section 117(a)(1)(A) provides that:

In the case of an individual, gross income does not include—
(1) any amount received—
(A) as a scholarship at an educational organization described in section 170(b)(1)(A)(ii),

Congress did not define the term "scholarship" in section 117. The regulations under section 117 define a "scholarship" as:

an amount paid or allowed to, or for the benefit of, a student, whether an undergraduate or a graduate, to aid such individual in pursuing his studies. The term includes the value of contributed services and accommodations (see paragraph (d) of this section) and the amount of

tuition, matriculation, and other fees which are furnished or remitted to a student to aid him in pursuing his studies. * * * *If an educational institution maintains or participates in a plan whereby the tuition of a child of a faculty member of such institution is remitted by any other participating educational institution attended by such child, the amount of the tuition so remitted shall be considered to be an amount received as a scholarship.* [Sec. 1.117-3(a), Income Tax Regs.; emphasis supplied.]

Petitioners rely on this last sentence of section 1.117-3(a), Income Tax Regs., to support their position that the tuition assistance awards are excludable scholarships.

The parties differ as to the correct interpretation of the words "remitted" and "participating" which appear in this sentence of the regulations. Respondent contends that, as used here, "remit" means "waive," and that both the institution employing the faculty member and the institution educating the child must be participating in a single plan. Respondent maintains that the regulation was directed at reciprocal arrangements between institutions through which each waives tuition for children of the other's faculty.

Petitioners assert that "participating" means "receiving or partaking of" and that "remit" means "send" or "transmit" as well as "waive." Petitioners note that the last sentence of section 1.117-3, Income Tax Regs., follows language explaining section 117 in the committee reports accompanying the Internal Revenue Code of 1954, but that the committee reports use the words "remitted at" rather than "remitted by." Petitioners contend that this language allows "remit" to be interpreted as either "waive" or "transmit," and that Congress could have no basis for distinguishing between bilateral waivers of tuition between institutions and direct payments by one institution to another institution.

The Secretary of the Treasury is responsible for administering the tax laws, and his regulations must be upheld if they implement congressional intent. *United States v. Cartwright*, 411 U.S. 546, 550 (1973). We must consider the legislative history of section 117 for evidence of legislative purpose.

Section 117 was enacted to set "forth rules for determining the extent to which scholarships and fellowship grants * * * [were] to be included in gross income and [to] * * * [eliminate] the existing confusion as to whether

such payments * * * [were] to be treated as income or as gifts." H. Rept. 1337, 83d Cong., 2d Sess. 16 (1954). The term "scholarship" is not defined in the committee reports, but tuition remission plans are specifically described:

If an educational institution (as defined in sec. 151(e)(4)) maintains or participates in a plan whereby the tuition of a child of a faculty member of any such institution is remitted at any other participating educational institution (as defined in sec. 151(e)(4)) attended by such child, the amount of tuition so remitted shall be considered to be an amount received as a scholarship under this section. [H. Rept. 1337, 83d Cong., 2d Sess. A37 (1954); S. Rept. 1622, 83d Cong., 2d Sess. 188 (1954).]

The policy which Congress intended to implement by including tuition remission plans as scholarships is not stated in the legislative history.

In *Wheeler v. United States,* 768 F.2d 1333, 1337 (Fed. Cir. 1985), the Circuit Court concluded that:

Congress could have reasonably decided to exempt tuition remissions for children of college faculty members as a way of promoting higher education by encouraging qualified people to enter and to remain in the academic teaching profession despite low earnings.

If that is indeed the case, it may be that any tuition assistance plan maintained by a university for its faculty's children satisfies the legislative purpose. We cannot, however, speculate that Congress intended something other than what was specifically stated in the legislative history. Our reading of the committee report's statement on tuition remission plans leads us to conclude that Congress was referring to reciprocal tuition waiver arrangements involving two or more educational institutions which participate in a plan. The language "remitted at" means "waived by." Section 1.117-3(a), Income Tax Regs., adopts this sentence almost verbatim except for using the phrase "remitted by" instead of "remitted at." The different preposition does not change the meaning of the sentence. We therefore find that the regulation implements congressional intent and that respondent's interpretation of the regulation is correct.

The LCF tuition assistance awards were not tuition waivers under a plan between NYU or the law school and the schools attended by petitioner's daughters. They were cash payments made by an educational institution which

maintains its own program of tuition assistance in order to benefit its faculty members and administrators and their families. This is not a tuition remission plan described in section 1.117-3(a), Income Tax Regs.

Our holding on this issue agrees with the holding of the District Court in *Western Reserve Academy v. United States,* 619 F. Supp. 394, 401 (N.D. Ohio 1985), affd. per curiam 801 F.2d 250 (6th Cir. 1986). In that case, the court considered whether cash tuition assistance awards paid to faculty members for use in defraying the undergraduate college expenses of their children were compensation for withholding and FICA tax purposes. The court determined that these tuition assistance awards did not qualify as scholarships under section 1.117-3(a), Income Tax Regs.

Moreover, section 1.117-4, Income Tax Regs., provides that amounts paid as compensation for services are not scholarships under section 117. We view these tuition assistance awards as compensatory in nature. A child's eligibility to apply for and receive an award is linked to the employment of his or her parent by the law school. The awards thus do not meet the generally accepted definition of scholarships as set forth in *Bingler v. Johnson,* 394 U.S. 741, 751 (1969):

the ordinary understanding of "scholarships" and "fellowships" [are] relatively disinterested, "no strings" educational grants, with no requirement of any substantial quid pro quo from the recipients.

Our holding that these awards are compensation to petitioner rather than scholarships is supported by the fact that the school considers neither the academic merit nor the financial need of the student in making the award. Moreover, the LCF program was viewed as a way to remain competitive with other law schools in attracting faculty members. As such, it was considered one of the benefits available to faculty members.

This Court and others have previously considered the nature of payments made under educational benefit plans for employee's dependents, and have determined that they constitute additional compensation to the employee. See *Wheeler v. United States, supra; Greensboro Pathology Associates, P.A. v. United States,* 698 F.2d 1196 (Fed. Cir.

1982); *Grant-Jacoby, Inc. v. Commissioner*, 73 T.C. 700 (1980); *Armantrout v. Commissioner*, 67 T.C. 996 (1976), affd. 570 F.2d 210 (7th Cir. 1978). We find these cases to be controlling. We hold that the tuition payments made by LCF on behalf of petitioner's children are compensation to him, and not tax-free scholarships.

Petitioner argues that whether or not the LCF tuition assistance awards constitute scholarships under section 117, respondent was required to treat them as scholarships because of the "fringe benefit moratorium" enacted by Congress in 1978, which was in effect at the time the notice of deficiency was issued in this case.

The "fringe benefit moratorium," enacted by Congress in 1978, was effective for the period October 1, 1977, through December 31, 1983. Pub. L. 95-427, as extended.[3] The purpose of the moratorium was to prevent administrative action by the Internal Revenue Service that was inconsistent with its substantive position as of October 1, 1977 regarding the taxation of fringe benefits. During the period of the moratorium, Congress intended to review the tax treatment of fringe benefits and ultimately to legislate tax policy in that area. See H. Rept. 95-1232, at 5 (1978), 1978-2 C.B. 365; S. Rept. 96-433, at 4 (1979), 1980-1 C.B. 487.

The moratorium specifically precluded only the issuance of regulations relating to fringe benefits.[4] The legislative history, however, referred to other significant departures by the Treasury Department from its historical treatment of fringe benefits "through the issuance of revenue rulings or revenue procedures, etc." H. Rept. 95-1232 *supra* at 5,

---

[3]The moratorium as originally enacted was to cover the period May 1, 1978, through Dec. 31, 1979, and was later extended. See Act of October 7, 1978, Pub. L. 95-427, sec. 1, 92 Stat. 996 (1978); Tax Treatment Extension Act of 1977, Pub. L. 95-615, sec. 3, 92 Stat. 3097 (1978); Act of December 29, 1979, Pub. L. 96-167, sec. 1, 93 Stat. 1275 (1979); and Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 801, 95 Stat. 172, 349 (1981).

[4]Pub. L. 95-427, sec. 1, 92 Stat. 996 (1978) provided as follows:

(a) IN GENERAL.—No fringe benefit regulation shall be issued—

(1) in final form on or after May 1, 1978, and on or before December 31, 1979, or

(2) in proposed or final form on or after May 1, 1978, if such regulation has an effective date on or before December 31, 1979.

(b) DEFINITION OF FRINGE BENEFIT REGULATION.—For purposes of subsection (a), the term "fringe benefit regulation" means a regulation providing for the inclusion of any fringe benefit in gross income by reason of section 61 of the Internal Revenue Code of 1954.

1978-2 C.B. at 366, S. Rept. 96-433, *supra* at 5, 1980-1 C.B. at 488.

Petitioner maintains that respondent was directed by the moratorium to "freeze" the substantive law to be applied to the taxation of fringe benefits. During the period of the freeze, respondent was bound to continue to apply the substantive rules of law as reflected in his administrative position as of October 1, 1977. At trial, petitioner offered in evidence numerous private letter rulings and technical advice memoranda issued by respondent in order to prove that, as of October 1, 1977, respondent's position was to treat tuition assistance programs such as LCF's as tuition remission plans qualifying as scholarships.[5] Petitioner argues that by now taking a position that the LCF tuition assistance awards were not tax-free scholarships, respondent has deviated from prior administrative practice and violated the fringe benefit moratorium, and thus we should hold for petitioner on the substantive issue.[6]

Respondent does not deny that the fringe benefit moratorium was in effect at the time he issued the notice of deficiency in this case, but argues (1) this is a new issue not raised by petitioner in his petition, and thus cannot be considered by this Court; (2) this Court has no jurisdiction over this matter; (3) this Court cannot redress a violation of the fringe benefit moratorium; (4) the issuance of a notice of

---

[5]At trial, respondent objected to the admission of these documents (petitioner's exhibits 27, 28, 29, 30, 31, 38 and 39) into evidence, but offered additional private letter rulings and technical advice memoranda (respondent's exhibits AA and AB) in the event the Court received petitioner's offered exhibits. Respondent's objection was based on hearsay, authenticity, and relevancy grounds. We overruled his authenticity and hearsay objections but reserved ruling on the relevancy question. We now rule that the offered documents are not relevant and sustain respondent's objection to their admission.

Private letter rulings and technical advice memoranda are not authority in deciding questions of substantive law. See sec. 6110(j)(3). The documents thus can have no relevance to our determination of the first issue in this case, namely whether or not the LCF tuition assistance payments constitute scholarships under sec. 117. As for the second issue, the documents could have relevance to the determination of respondent's administrative position as of Oct. 1, 1977. However, since we are today deciding that we have no jurisdiction to consider the fringe benefit moratorium in deciding this case, respondent's administrative position as of Oct. 1, 1977, is irrelevant. Petitioner's exhibits 27, 28, 29, 30, 31, 38 and 39 and respondent's exhibits AA and AB are thus not received in evidence.

[6]Petitioner's logic on this point is somewhat flawed. On one hand, petitioner states that respondent is prohibited from determining that the LCF tuition awards are not scholarships, but then concedes that respondent was not prohibited from issuing the notice of deficiency. Petitioner admits that this Court is not limited by the moratorium in resolving the substantive legal issue as we see fit, but then states that we cannot enforce a determination by respondent which is in violation of the moratorium, and must decide the issue in accordance with respondent's administrative interpretation of sec. 117 as of Oct. 1, 1977.

deficiency is not a violation of the moratorium; and (5) respondent's administrative position on this issue as of October 1, 1977, was not to treat these payments as scholarships.

We disagree that this issue was raised by petitioner untimely. Respondent maintains that since petitioner only raised the issue of the fringe benefit moratorium in his trial memorandum, Rules 34 and 39 preclude our consideration of this issue. Petitioner responds by stating that respondent had ample notice of the issue, and was thus at no disadvantage; in fact, respondent submitted a supplemental trial memorandum relating to the fringe benefit moratorium issue at trial. We agree with petitioner that respondent knew of and prepared for this issue, and was neither surprised nor disadvantaged by it. *Stewart v. Commissioner,* 714 F.2d 977 (9th Cir. 1983), affg. a Memorandum Opinion of this Court; *Laney v. Commissioner,* 674 F.2d 342 (5th Cir. 1982). Although the fringe benefit moratorium issue was not included in the pleadings, we deem it tried by consent under Rule 41(b)(1).

We do, however, agree with respondent that the Tax Court has no jurisdiction over this matter. Petitioner would have us nullify respondent's determination of an otherwise valid deficiency because of the moratorium. While we can consider any matter bearing on a tax deficiency, we have no power to enforce this particular prohibition. It relates to the administrative procedures of an executive agency, which we have no power to control.

The fringe benefit moratorium, as enacted by Congress, is an instruction to respondent. It does not purport to change existing law nor to bind this Court in interpreting the statute. It includes no authorization for its enforcement and no remedy for its violation.

Petitioner argues that the proper remedy lies in the courts:

That remedy quite plainly is that the courts will not enforce a determination by the Service that violates the mortorium and, in egregious situations, the courts may award court costs and fees to the aggrieved taxpayer under I.R.C. section 7430. [Brief for petitioners at 23.]

Petitioner does not cite any direct authority for this statement.

The Tax Court is a court of limited jurisdiction. See generally secs. 6213, 7442, and *Dudley v. Commissioner*, 258 F.2d 182 (3d Cir. 1958), affg. 28 T.C. 992 (1957). We have only the powers expressly conferred on us by Congress, and may not apply equitable principles to expand our jurisdiction beyond the limits of section 7442. See *Commissioner v. Gooch Milling Co.*, 320 U.S. 418 (1943); *Lorain Avenue Clinic v. Commissioner*, 31 T.C. 141, 164 (1958). We have no jurisdiction to exercise the broad common law concept of judicial power invested in courts of general jurisdiction by article III of the Constitution. *Estate of Rosenberg v. Commissioner*, 73 T.C. 1014, 1017 (1980); cf. *Berkery v. Commissioner*, 90 T.C. 259 (1988) (Hamblen, J., concurring). The fringe benefit moratorium does not specify a remedy for its violation and does not expressly confer jurisdiction upon this Court to enforce the moratorium. In the absence of express statutory authority we will not consider the moratorium as having any bearing on the outcome of this case.

The remedy petitioner seeks is one which is generally unavailable in this Court. On brief, petitioner argues that respondent was prohibited from determining these tuition payments were income because of the moratorium. The remedy he specifically requests, however, is merely that we evaluate respondent's claims in light of respondent's administrative position on October 1, 1977, and hold accordingly on the substantive issue (although petitioner concedes, in his next breath, that this Court is not limited by the moratorium in our holding on the substantive issue). See brief for petitioners, at 20-21. As we see it, what petitioner is seeking here is to enjoin respondent from asserting a position in his statutory notice which is in violation of the moratorium. This Court has no power to grant injunctions. Secs. 7442, 7402. We cannot prevent the issuance of a notice of deficiency, nor will we look behind a valid notice of deficiency at respondent's motives, policies, and procedures. See *Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 326 (1974). Moreover, the moratorium did not purport to prohibit respondent from issuing statutory

notices. Our authority allows us only to consider and determine the correctness of respondent's determination of deficiency. We have done so in this case, and we have found that determination to be correct.

Since the LCF tuition payments were not tax-free scholarships, but were compensation, petitioner must include these amounts in his gross income pursuant to section 61, and respondent's deficiency determination is sustained.

Due to respondent's concession on the negligence issue,

*Decision will be entered under Rule 155.*

Reviewed by the Court.

STERRETT, PARKER, COHEN, GERBER, and WRIGHT, *JJ.*, agree with the majority opinion.

KÖRNER, *J.*, concurs in the result only.

RUWE, *J.*, did not participate in the consideration of this case.

---

WHITAKER, *J.*, concurring: I write to express my disagreement with that part of the majority opinion which holds that this Court has no jurisdiction to consider the fringe benefit moratorium.

It is inherent in the exercise of our jurisdiction "to redetermine the correct amount of the deficiency"[1] or to determine an overpayment of tax,[2] that we take into account any Federal statute which bears on any issue before us. The fringe benefit moratorium is such a Federal statute.

The majority concludes that this statute relates only to the administrative procedures of an executive agency, and that because it does not expressly confer jurisdiction upon this Court to enforce the moratorium, we lack enforcement jurisdiction. I agree that we lack specific enforcement jurisdiction. But it does not follow that the statute has no bearing on the outcome of this case.

The majority refuses to consider the possible substantive effect of this statute. In my opinion, the moratorium, as a congressional direction to respondent to freeze its ruling position on fringe benefits, may make relevant in a proceed-

[1] Sec. 6214(a).
[2] Sec. 6512(b).

ing before this Court respondent's ruling position during the year in issue. In addition, the effect, if any, of the moratorium on applicable law should be considered. Finally, violation of the moratorium, as claimed by petitioners, might be sufficient to classify respondent's action in issuing the statutory notice as arbitrary.

As Judge Swift points out in his dissent, respondent's administrative position can be, under appropriate circumstances, relevant to our determination of a petitioner's tax liability. While respondent's administrative position is generally considered to be simply his litigating position (*Crow v. Commissioner,* 85 T.C. 376, 389 (1985)), in rare circumstances the position has risen to the level of a statute. See, e.g., *Commissioner v. Stedges,* 386 U.S. 287 (1967). This occurs when there is evidence of "a consistent and longstanding administrative position with prior congressional or judicial approval." *Crow v. Commissioner, supra.* The evidence of respondent's prior administrative position consists of private letter rulings and technical advice memoranda, none of which were required to be or were published prior to the addition of section 6110 to the Code in 1976. Moreover, by that statute, such documents do not have precedential status (sec. 6110(j)(3)) and should not be taken into account as part of the applicable law. The doctrine of *Commissioner v. Stedges, supra,* is not applicable here.

An additional issue for our consideration is whether the moratorium in effect binds this Court to respondent's ruling position in 1977. It is clear from the statute that Congress did not intend to incorporate respondent's ruling position on fringe benefits into the Internal Revenue Code for the moratorium period.[3] Therefore, this legislation simply cannot be construed as incorporating into the Internal Revenue Code respondent's ruling position on fringe benefits.

Although petitioners' contentions lack desirable clarity, they appear to argue that issuance of this statutory notice was contrary to the spirit of the statute since its purpose is perhaps frustrated by respondent's audit activity. Thus,

---

[3] Congress could have enacted into law respondent's Oct. 1, 1977, position on various fringe benefits for the moratorium period but there is no evidence of a congressional intent to do so.

respondent's action in issuing the statutory notice possibly could be characterized as arbitrary. *Helvering v. Taylor,* 293 U.S. 507 (1935). See also *Riland v. Commissioner,* 79 T.C. 185, 201 (1982). The relief flowing from that characterization would only be a shifting to respondent of the burden of going forward with the evidence. In this case, the record is complete and a shifting of the burden of going forward would have had no bearing on the outcome.

For the foregoing reasons, I agree with the result reached by the majority. But we should not allow an imprecision in petitioners' statement of their position to blind us to fact that the fringe benefit moratorium is a Federal statute pertinent to the issues in this case. Petitioners are entitled to have its effect fully explored by the Court.

CHABOT, NIMS, HAMBLEN, JACOBS, and GERBER, *JJ.,* agree with this concurring opinion.

---

SWIFT, *J.,* dissenting: Contrary to the majority opinion, in the context of this case, the effect of the fringe benefit moratorium on the excludability in 1979 of a particular type of tuition assistance program does not raise a question of jurisdiction. The existence of the moratorium merely highlights a question frequently asked by this and other courts (namely, what was respondent's administrative position, if any, with respect to the taxation of the particular items of income, deduction, or credit that are at issue?).

Although respondent's administrative position generally is not binding on a court (see *Crow v. Commissioner,* 85 T.C. 376, 389 (1985)), it almost always is relevant to the court's analysis. For example, in *CSX Corp. v. Commissioner,* 89 T.C. 134, 144, 146 (1987), interpretative regulations issued by respondent were essential to this Court's analysis.[1] In *Phillips v. Commissioner,* 86 T.C. 433, 441, 442 (1986) (Court-reviewed), and in *Twin Oaks Community*

---

The legislation itself is plain and unambiguous. Fringe benefit regulations are not to be issued. The legislative history perhaps would extend the freeze to revenue rulings and revenue procedures. If the "etc." after the words "revenue procedures" is given its broadest scope, perhaps issuance of private letter rulings on fringe benefits would be prohibited.

[1] Legislative regulations, as distinguished from interpretative regulations or rulings, have the force and effect of law and will be controlling on the courts unless they are issued improperly or are clearly contrary to the will of Congress. *Commissioner v. South Texas Lumber Co.,* 333 U.S. 496, 503 (1948); *Georgia-Pacific Corp. v. Commissioner,* 63 T.C. 790, 801-802 (1975).

*v. Commissioner,* 87 T.C. 1233, 1252 (1986), revenue rulings issued by respondent were considered carefully in reaching our decisions. In numerous cases, administrative positions taken by respondent in interpretative regulations and rulings have been considered relevant and helpful, although not controlling, in our analysis.

An example illustrates the potential importance of respondent's administrative position. Assume respondent in various revenue rulings issued over the course of 20 years consistently and uniformly had treated the type of tuition assistance programs at issue herein as tax exempt. Under the majority's approach (either because we would be regarded as not having jurisdiction to consider it or because it would be regarded as irrelevant) that 20-year history would be ignored. Under the approach suggested by this dissenting opinion, that 20-year history would be relevant, and it would have a significant influence on our decision.

I believe it is particularly appropriate for us to take into account respondent's administrative position concerning areas of the Federal tax law that have not been comprehensively addressed by Congress. Courts routinely give considerable deference to interpretations of administrative agencies where the statute in question is vague or not comprehensive. The taxability of fringe benefits is such an area, and the administrative position of respondent with regard thereto therefore becomes especially relevant. The Supreme Court explained this principle as follows:

> There is no statutory provision as to what, if any, deference courts should pay to the Administrator's conclusions. * * * This Court has long given considerable and in some cases decisive weight to Treasury Decisions and to interpretative regulations of the Treasury and of other bodies that were not of adversary origin.
>
> We consider that the rulings, interpretations and opinions of the Administrator * * * while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.
>
> [*Skidmore v. Swift & Co.,* 323 U.S. 134, 139-140 (1944).]

The fringe benefit moratorium does not in any way detract from the above principle. To the contrary, it would appear to enhance the weight to be given respondent's administrative position with regard to the taxation of fringe benefits. Through the moratorium, Congress affirmatively interjected itself into the otherwise broad discretionary authority of respondent in this area under section 61 of the Code and mandated that respondent's administrative position be frozen in place. At the least, in light of the moratorium, this Court undermines the role and will of Congress by refusing even to consider respondent's administrative position with regard to the taxation of fringe benefits, as in effect in 1979 and earlier years.

SHIELDS, CLAPP, WILLIAMS, and WELLS, *JJ.,* agree with this dissent.

---

WELLS, *J.* dissenting: I agree with Judge Swift's dissent insofar as it goes. I would go further than Judge Swift, however, and hold that payments under the tuition assistance program are exempt from income. I base this conclusion upon the moratorium,[1] which became effective on October 1, 1977.

Although the moratorium, itself, only specifically mentioned a freeze on issuance of regulations, Congress' intent was more expansive. *United States v. Ryan,* 284 U.S. 167, 175 (1931). The House report stated:

While the provisions of this bill relate only to the issuance of regulations, it is the intent of the committee that the Treasury Department will not alter, or deviate from, in any significant way *the historical treatment of fringe benefits through the issuance of revenue rulings or revenue procedures, etc.*

*Effective date*

The provision is effective upon enactment.

*Revenue effect*

This provision will not affect estimated budget receipts since it, in effect, *continues present administrative practice.*

---

[1]The majority uses the term "moratorium" to describe the laws passed by Congress; however, I have not seen where Congress ever used the term to describe the laws. I use the term "moratorium" only to comport with the majority's language in describing the laws enacted by Congress. Also, I wonder whether the term "moratorium" might be a misnomer; it might be just as apt a description to label the laws as a "freeze" on the treatment of fringe benefits.

[H. Rept. 95-1232, 1978-2 C.B. 365, 366. Emphasis supplied.]

See also S. Rept. 95-746, 1978-2 C.B. 422, 424.

Respondent admits in his brief that "Congress' intent in enacting the moratorium was to prevent administrative action by respondent that was inconsistent with prior practice until Congress could review the fringe benefit issues and ultimately legislative tax policy in the area." Respondent's brief continues this admission with, "The moratorium was intended to prevent respondent from taxing types of fringe benefits that had previously been left untaxed until Congress could review the fringe benefit area." I assume respondent's admissions were based on the House report's statement that "present administrative practice" would continue. Thus, the enactment of the moratorium causes the historical treatment of fringe benefits by respondent to be particularly relevant to any determination of what the law is with respect to the taxability of tuition assistance programs.

Where respondent's argument and my view of the issue differ, however, is in establishing what the "historical treatment of fringe benefits" was at the time of the moratorium. Respondent asserts that the historical treatment of benefits such as those at issue is set forth in section 1.117-3(a), Income Tax Regs., which was adopted in 1956. I, however, do not read that regulation as explicitly stating that payments such as those made for petitioner's children do not qualify for exclusion from gross income. Rather, I note that there is evidence of more definite statements made by respondent of the historical treatment of such payments.

Respondent correctly notes that no relevant revenue rulings or revenue procedures were in force as of the moratorium's effective date. The majority refuses to consider the private letter rulings (PLRs) and technical advice memoranda (TAMs) that were outstanding on October 1, 1977. The majority concludes correctly that, under usual circumstances, such documents are not authority in deciding questions of law. The interposition of the moratorium by Congress, however, is an unusual circumstance.[2] In

---

[2]Even though PLRs and TAMs by themselves are not binding legal authority, both the Supreme Court and this Court have used PLRs to determine respondent's treatment of an

enacting the moratorium, Congress added greater weight to the existing, and theretofore nonprecedential, "historical treatment" by respondent in documents such as PLRs and TAMs. The House report addresses the treatment of fringe benefits through "revenue rulings, revenue procedures, *etc.*" (Emphasis supplied.) H. Rept. 95-1232, *supra* at 5, 1978-2 C.B. at 366. The insertion of "etc." into that sentence was redundant and totally meaningless unless Congress was stating that documents other than revenue rulings and revenue procedures, such as PLRs and TAMs, were included in the moratorium. Thus, I would not rely on PLRs and TAMs as per se authority by themselves; rather, I would utilize them as an analytical tool here because Congress chose to elevate respondent's positions in relevant PLRs and TAMs, i.e., respondent's "historical treatment," to positions of great meaning and relevance until such time as the moratorium expired (by which time Congress was hoping that it could have time to reevaluate and clarify the state of the law in the fringe benefit area).[3]

Petitioner has forwarded a TAM in support of the proposition that respondent's position as of October 1, 1977, was that tuition payments such as those made by New York University for petitioner's children were scholarships, and not includable in gross income. On February 5, 1977, TAM 7702089010B (the February TAM) was issued by respondent in regard to a scholarship plan sponsored by the University of Rochester (Rochester). The Rochester plan therein provided for a payment of up to $1,500 to defray costs of tuition of children who were dependents of regular faculty members and who attended another college or university. The plan also provided for a waiver of tuition costs for dependent children who attended Rochester. The only requirements of the plan were that the child's parent be employed by Rochester and that the child qualify as a

issue and his interpretation of law. See *Rowan Cos. v. United States,* 452 U.S. 247, 261 n. 17 (1981) (Supreme Court still considered PLRs as evidence of respondent's position, notwithstanding the enactment in 1976 of the provision in sec. 6110(j)(3) that PLRs have no precedential force); *Hanover Bank v. Commissioner,* 369 U.S. 672, 686-687 (1962); *Woods Investment Co. v. Commissioner,* 85 T.C. 274, 281 n. 15 (1985) (Court-reviewed).

[3]An argument could be made that, rather than simply elevating the historical treatment (as evidenced by PLRs and TAMS) to a position of relevance, Congress' intent in enacting the moratorium was to elevate the historical treatment, i.e, the present administrative practice, so as to codify that treatment and engraft it onto the Code.

dependent for Federal tax purposes. The Rochester plan thus is identical to the New York University plan of petitioner in all material respects.

The February 5, 1977, TAM reversed TAM 7612179010B, which had been issued to Rochester on December 17, 1976. The December TAM had held that the tuition provided under Rochester's plan did not qualify as a nontaxable scholarship. The holding of the February TAM was as follows:

> This Memorandum is to inform you that the technical advice memorandum of December 17, 1976, should not be applied to future years. Instructions will be issued by Audit regarding the treatment of tuition remission cases. It is our understanding that the instructions will conclude that, until publication of Service position, the issues presented in your technical advice request should not be raised.

In light of the history behind the February TAM, that paragraph only can be read to say that respondent's position, at least until a subsequent publication, was that he would not assert the issue of the taxability of the tuition payments. Respondent did not show that he published any contrary position or issued any contrary rulings after the February TAM and before the date the moratorium went into effect.[4] Thus, as of October 1, 1977, the date at which respondent's historical treatment was frozen by the moratorium, respondent's position was that of the February TAM, i.e., that he would not contest the nonincludability of the tuition payments in income of employees of educational institutions, such as New York University.

My conclusion is bolstered even more by a document forwarded as evidence by petitioner. This document was an analysis supporting TAM 7839006, issued by respondent on June 16, 1978. That TAM held that tuition payments by an employer were not includable in the employee's gross income.[5] The provisions under which the employer made the payments on behalf of the employee to the payee university

---

[4]Respondent did forward TAM 7703022130A, which was issued on Mar. 2, 1977. The employer in that TAM, however, was not "a section 151(c)(4) educational institution" (which is one described in sec. 170(b)(1)(A)(ii)), so the facts of that TAM are distinguishable from the issue herein.

[5]TAM 7839006 later was revoked by TAM 8146003, but it was revoked only because of a subsequent finding that the employer did not qualify as an educational organization described in sec. 170(b)(1)(A)(ii). Neither petitioner nor respondent suggests that New York University does not so qualify.

were, in all material aspects, like those of the New York University plan at issue herein.

The supporting document recommended that respondent not contest the includability of the tuition payments, based on the following:

> In proposing the amendments to Regulations 1-117(3)(a) and 1-117(4)(c) the Service gave recognition to the fact that the tuition remission programs being maintained by "educational institutions" are compensatory in nature and, therefore, cannot be considered as fellowships or scholarships under 117 of the Code. Subsequently an [sic] IR-1735 dated 1/13/77 the Service announced its withdrawal of the proposed regulations. The reason given by the Service was as follows:
>
> "On January 7, 1977 a public hearing was held on proposed regulations. Testimony presented at that hearing, as well as written statements submitted previously and thereafter, pointed out problems associated with changing the tax treatment of amounts received under tuition remission programs. In view of these problems and the joint study of the tax treatment of scholarships and fellowships called for by the House and Senate Committee Reports on the Tax Reform Act of 1976, it has been concluded that the notice of proposed rule making should be withdrawn.' [sic]
>
> To litigate this issue in the instant case, in the view of the undersigned, would appear to be *inconsistent with the Service's avowed position on tuition remission programs,* and may conflict with Policy Statement P-4-7 which prohibits discrimination as between taxpayers. [Emphasis supplied.]

Thus, although the TAM and supporting document were issued after the moratorium went into effect, I think they provide exemplary evidence of what respondent considered the historical treatment of fringe benefits to be when the moratorium went into effect only a few months earlier. In short, respondent was stating that his "avowed position" was not to contest the exclusion of such tuition payments from income, at least where the plan was maintained by a qualified educational institution.

The majority relies on several cases which it determines to be controlling, although it does not tell us why. Thus, I can not understand the majority's reasoning that it is bound by these cases. In *Wheeler; Greensboro Pathology Associates, P.A.; Grant-Jacoby, Inc.;* and *Armantrout,* none of the employers making the tuition payments was an educational institution. The holdings in those four cases comport with respondent's 1977 administrative position (as

noted in some of the above-referenced TAMs) that tuition payments by an employer which was not an educational institution were includable in gross income. The 1969 *Bingler* case cited by the majority is also distinguishable on the same ground. This analysis makes it readily apparent why the historical treatment of this issue by respondent is particularly relevant and telling. Congress knew the position of respondent at the time it enacted the moratorium and was telling respondent not to deviate from that position until Congress could decide what it wanted to do. See *Cammarano v. United States,* 358 U.S. 498, 511 (1959); *Massachusetts Mutual Life Ins. Co. v. United States,* 288 U.S. 269, 273 (1933).

I also believe that the majority's reliance on *Western Reserve Academy v. United States,* 619 F. Supp. 394 (N.D. Ohio 1985), affd. per curiam 801 F.2d 250 (6th Cir. 1986), is misplaced. First, the instant case is appealable to the Second Circuit, not the Sixth, so the holding of *Western Reserve* can be no more than persuasive to this Court. *Golsen v. Commissioner,* 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971).[6] Even on its facts, *Western Reserve* is distinguishable. The Court therein specifically noted, "This is not an action to determine faculty members' individual income tax liability for tuition awards made to their children." 619 F. Supp. at 396. The issue therein was the liability of the employer for withholding and FICA taxes on the quantum of the tuition remittances. A more significant difference between the two cases, however, is that the plan in *Western Reserve* paid the value of the tuition directly to the employee/parent (619 F. Supp. at 396); the school did not make direct payments to the other educational institution, as did the New York University plan (see majority opinion at p. 432). The most glaring defect in the *Western Reserve* case, however, is that the Court therein never considered the impact of the moratorium; the moratorium is mentioned nowhere in the Court's opinion. Thus, I would not give significant deference to the opinion since it failed to address a relevant, vital congressional directive on the issue at hand. In short, I am not persuaded that the cases

---

[6]I note also that the *Wheeler* and *Greensboro Pathology Associates, P.A.* cases were from the Federal Circuit, and we also are not controlled by decisions of that Court.

cited by the majority are sufficiently instructive for this Court to rely on them.

Last, let me stress that I have examined the TAMs only to determine the historical treatment of the issue by respondent, which Congress, by virtue of the moratorium, elevated to a position of significant relevance in any analysis. If section 117 or the regulation thereunder, section 1.117-3(a), had adequately provided for the treatment of payments such as those remitted for petitioner by New York University, neither the moratorium nor the above analysis would have been required.[7] Congress, however, recognized the inadequacies in this area of the law and chose to adopt the moratorium, which, as the committee reports noted, "continues present administrative practice." H. Rept. 95-1232, *supra,* 1978-2 C.B. at 366; S. Rept. 95-746, *supra,* 1978-2 C.B. at 424. In commenting on the revenue effect of "present administrative practice," both the House and Senate reports declare that the moratorium would "not affect estimated budget receipts." Although Congress agreed that respondent could *study* "the question of the appropriate tax treatment of fringe benefits," Congress specifically thought respondent was prevented from "deviating from the present administration of the tax laws." (Emphasis supplied.) S. Rept. 95-746, *supra,* 1978-2 C.B. at 424. In advancing positions such as those respondent has argued in this case, respondent has contravened the congressional freeze. The audit process and respondent's determination of deficiencies are included within the scope of the administration of the tax laws. Congress certainly thought it was preventing respondent from advancing those positions on audit when it specifically declared what *revenue* impact the moratorium would have, i.e., none. Respondent himself thought he was prevented from raising the issue, as shown in our above discussion of respondent's TAMs (which are issued for revenue agents in the course of an audit to give guidance on what positions the Government may maintain).

Thus, considering the totality of section 117 as written, its legislative history, the impreciseness of the language of

---

[7]Even respondent ignores his own previous interpretations of that regulation in order to advance an inconsistent argument in this case.

the regulations, and, by authority of the moratorium, respondent's historical treatment of payments such as of those herein, I would hold for petitioner and find that the tuition remissions were not includable in income. To hold otherwise would be to ignore the mandate of Congress' moratorium and find that it was a nullity. This Court's role here is to find Congress' intent—not to abrogate it.[8]

CLAPP, WILLIAMS, and WHALEN, *JJ.*, agree with this dissent.

---

[8]In reference to the moratorium, the majority suggests that this Court has no jurisdiction over the matter because the statute included no remedy for a violation by respondent. There is an alternative argument, with which I do not necessarily agree, in response to the issue of our jurisdiction. Respondent's failure to adhere to the "historical treatment of fringe benefits" might be said to be a failure to comply with the statutory requirements of the moratorium. In such a case, respondent's failure to comply with such statutory requirements "renders the deficiency notice null and void and leaves nothing on which Tax Court jurisdiction can rest." *Scar v. Commissioner,* 814 F.2d 1363, 1370 (9th Cir. 1987). I am left to wonder, however, why the majority neglects to address this argument in its discussion of the Court's jurisdiction.