ROLAND E. RASMUSSEN AND MARGARET L. RASMUSSEN, DECEASED, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rasmussen v. Commissioner
Docket No. 7264-92
United States Tax Court
T.C. Memo 1994-311; 1994 Tax Ct. Memo LEXIS 314; 68 T.C.M. (CCH) 30; July 6, 1994, Filed *314 Decision will be entered under Rule 155. For petitioners: Don W. Hales. For respondent: Mark A. Weiner. COHEN
COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Addition to Tax Year
Deficiency
Sec. 6651(a)
1983
$ 6,031
- 1984
6,918
- 1985
6,615
- 1986
9,350
$ 1,402
1987
6,685
- Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. After concessions, the issues for decision are: (1) Whether petitioners may exclude from income, pursuant to section 107, amounts paid to Roland E. Rasmussen (petitioner) as "parsonage allowance"; (2) whether petitioners may exclude from income, pursuant to section 117, tuition reductions for their children's education that were received by petitioners due to petitioners' employment by Faith Baptist Church and Schools; (3) whether petitioners are entitled to additional deductions for taxes paid to the State of California; and (4) whether petitioners are liable for the *315 section 6651(a) addition to tax for 1986. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. At the time of the filing of the petition in this case, petitioners resided in California. Petitioner was a pastor of Faith Baptist Church (the church) in Canoga Park, California, beginning in 1960, and was a minister of the gospel. Margaret L. Rasmussen (Mrs. Rasmussen), was at all relevant times the principal of the Faith Baptist Schools (the school). Petitioners purchased a residence on Delmonico Avenue, West Hills, California (the Delmonico property), on July 1, 1970, for $ 50,250. Petitioners financed the purchase of the property by borrowing funds from J. Eguquiza (Eguquiza). Eguquiza held a deed of trust in the property. Repayments on the loan from Eguquiza were collected for Eguquiza by Bank of America and included 7-percent interest. Petitioners paid $ 250 per month on this loan. Legal title to the property was transferred to the Roland E. Rasmussen Trust in October 1976. The loan from Eguquiza was paid off in November 1987. From 1982 through 1987, petitioner borrowed from and repaid the *316 following amounts to the church: Amount
Amount
Year
Borrowed
Repaid
1982
$ 22,250
$ 6,000 1983
13,184
16,800
1984
15,790
16,800
1985
30,000
16,800
1986
11,000
18,800
1987
4,000
22,700
Totals
$ 96,224
$ 97,900
Petitioner used the proceeds of these church loans to pay taxes owed by petitioners and to pay for petitioners' children's education, Mrs. Rasmussen's illness, and refurbishing petitioners' house. A document entitled "Acknowledgement of Promissory Obligation and Security Secured by Real Property" was executed on May 12, 1984, by petitioner and the "Board of Deacons" of the church (the 1984 acknowledgment). Two more documents with the same title were executed by petitioner, the "Loan Committee Chairman", and the "Loan Committee Secretary"; one was undated but referred to a loan in August 1985 (the 1985 acknowledgment), and the other was dated November 4, 1986 (the 1986 acknowledgment). The 1984, 1985, and 1986 acknowledgments will collectively be referred to as the acknowledgments. The acknowledgments referred to loans from the church to petitioner in the following amounts: Date of Loan
Amount of Loan June 1982
$ 22,250.00 February 1983
3,620.00
June 1983
802.69
July 1983
5,711.78
August 1983
3,050.00
January 1984
5,790.00
August 1985
34,000.00
May 1986
33,253.85
Total
$ 108,478.32
*317 The discrepancies between the amounts loaned to petitioner and the amounts listed in the acknowledgments are unexplained. The acknowledgments provided for interest rates "equal to current Treasury Bill rate[s] for the duration of the obligation, said rates to be fixed with each setting of such Treasury Bill rates." The 1982 acknowledgment provided that the obligation incurred therein "shall and is deemed by the parties to be secured by a non-recorded deed of trust on the * * * [Delmonico property], owned by Dr. Rasmussen, and held by the Deacons." The 1985 and 1986 acknowledgments had substantially the same provision although there was inconsistency in descriptions of the Delmonico property. Other than the acknowledgments, there were no documents purporting to be a second deed of trust held by the church on the Delmonico property. The church did not receive an appraisal of the property nor did it make any inquiry regarding any encumbrances on the property. The church recorded that it paid petitioner the following amounts denominated as salary and "parsonage allowance": Year
Salary
Parsonage Allowance 1983
$ 14,856.00
$ 27,600.00
1984
15,744.00
27,600.00
1985
7,759.24
37,350.00
1986
14,861.56
37,350.00
1987
29,977.32
27,600.00
*318 From the amounts paid to petitioner from the church that were designated as parsonage allowance, petitioners made payments in the following amounts and to the following payees: Year
Amount
Payee In each of
$ 3,000 Bank of America  1983/1984/1985
16,000
Church  $ 19,800
1986
$ 3,000 Bank of America  18,800
Church  $ 21,800
1987
$ 2,557 Bank of America  22,700
Church  $ 25,257
During 1983, 1984, and 1985, petitioners' children attended the school. By reason of their employment with the church and the school, petitioners, as well as all other full-time employees of the school, received tuition reductions for their children's education at the school. These reductions were in the amounts of $ 3,683, $ 3,921, and $ 2,421 for 1983, 1984, and 1985, respectively. For 1985, the $ 2,421 amount only reflected the amount of tuition reduction through June 30, 1985. These amounts were not substracted from petitioners' respective salaries. On their 1983 tax return, petitioners claimed a deduction for $ 8,761 in State income taxes paid to the State of California. Petitioners' 1986 tax return was dated October 15, 1987, and was received by the Internal *319 Revenue Service Fresno Service Center on October 19, 1987. Statutory notices of deficiency were sent to petitioners on January 13, 1992, for 1983, 1984, and 1985, and on January 15, 1992, for 1986 and 1987. OPINION Parsonage Allowance
Section 107 provides: In the case of a minister of the gospel, gross income does not include -- * * * (2) the rental allowance paid to him as part of his compensation, to the extent used by him to rent or provide a home.
Section 1.107-1(c), Income Tax Regs., elaborates on this provision: A rental allowance must be included in the minister's gross income in the taxable year in which it is received, to the extent that such allowance is not used by him during such taxable year to rent or otherwise provide a home. Circumstances under which a rental allowance will be deemed to have been used to rent or provide a home will include cases in which the allowance is expended (1) for rent of a home, (2) for purchase of a home, and (3) for expenses directly related to providing a home. * * *
Respondent allowed exclusion of the portion of the parsonage allowance used by petitioners to pay $ 250 a month on the initial purchase loan *320 from Eguquiza and to make other payments for providing a home such as maintenance, utilities, and gardening services. Respondent disallowed exclusion of the portion of the parsonage allowance that was used by petitioners to repay the loans from the church, as follows: Exclusion Allowed Parsonage House Exclusion
Year
Allowance Maintenance Purchase
Disallowed
1983
$ 27,600
$ 7,800 $ 3,000
$ 16,800
1984
27,600
7,800
3,000
16,800
1985
37,350
17,550
3,000
16,800
1986
37,350
15,550
3,000
18,800
1987
27,600
2,343
2,557
22,700
Petitioners argue that they are entitled to exclude the disallowed amounts because the church loans were secured by petitioners' residence and, thus, payments on the church loans were payments to provide a home. Respondent argues that the record does not support petitioners' contention that the church loans were secured by petitioners' home. The acknowledgments were not executed until well after the church began to extend loans to petitioner and, on their faces, reflect loan amounts different from those extended to petitioner by the church. There is no evidence that the amount of the church loans was justified *321 by the value of the Delmonico property. The church did not attempt to value the property or to identify any prior security interests on the property. No deed of trust or document purporting to be a deed of trust was recorded with respect to the church loans. Thus, it is not clear that the intent or the effect of the acknowledgments was to create a security interest in the property. Respondent further contends that, even if the loans were secured by petitioners' home, the payments on the church loans were not used to "provide a home" as required by section 107. Respondent maintains that petitioners owned their home since 1970 and therefore the parsonage allowance was not used by them to "provide a home" within the meaning of section 107(2). Respondent cites Swaggart v. Commissioner, T.C. Memo. 1984-409, in which the Commissioner disallowed exclusion of a parsonage allowance paid to a minister who owned his own home outright and did not use the parsonage allowance for payments to provide a home, such as "rent; mortgage payment; insurance on residence; taxes on residence; utilities on residence; maintenance on residence; repairs on residence; improvements *322 to residence; fixtures for residence; appliances for residence; or furnishings for the residence." Id. The taxpayer in that case argued that the statute discriminated against ministers who use their own separate funds to provide homes for themselves, as opposed to other ministers who rent homes or who buy homes encumbered with debt and thereafter make payments of principal and interest on an existing mortgage. The Court in Swaggart relied on Reed v. Commissioner, 82 T.C. 208 (1984), which concluded that "Congress intended to exclude from the minister's income only that portion of his compensation paid by the church which was actually used by the minister for the purposes of renting or otherwise providing a home for himself." Swaggart v. Commissioner, supra.The Court further stated that it would not ignore "the clear statutory language and broaden the benefit conferred by section 107 beyond that which Congress intended." Id. Petitioner argues that the Swaggart case is distinguishable in that no mortgage, loan, or security interest in the taxpayer's home was involved in that case and that the existence *323 of a security interest here should change the outcome on the issue of the excludability of the parsonage allowance payments. In support of their contention that payments on a loan, secured by their home, should be considered payments to "provide a home", petitioners cite a "special ruling" by respondent which states in part that, "if a minister owns or is buying a home, that portion of the allowance may be excluded to the extent that it is used for the maintenance and purchase of the home, such as the down payment, installment payments on loans secured by mortgages on the home, interest, taxes, and repairs." Rulings and Comments on the 1954 Code, Special Ruling, Sept. 1, 1955, CCH 1954 Code Transfer Binder, par. 37,361. This special ruling provides for exclusion of that portion of the allowance used for the maintenance and purchase of a home. The ruling expands on examples of payments that may be used for such purposes. Petitioners also argue that section 163(h)(3)(C) and (D), which provides that home equity indebtedness incurred before October 13, 1987, should be treated as "acquisition indebtedness", supports their position. Section 163(h)(3) explicitly states that its provisions *324 apply for purposes of that subsection. Thus, the provisions of section 163(h)(3) are inapplicable to the treatment of a "home equity" loan with respect to the exclusion for the rental value of parsonages provided by section 107. Exemptions from gross income are to be construed narrowly, Bingler v. Johnson, 394 U.S. 741, 751-752 (1969), and, here, neither section 107 nor the regulations thereunder provide for the exclusion of payments on loans secured by a home if they are not used to "provide a home". The proceeds of the church loans were used to pay personal expenses of petitioners unrelated to their home. Thus, even assuming that the loans were secured by the Delmonico property, petitioners have not shown that the portion of the parsonage allowance used to repay the church loans was used for the maintenance or purchase of their home. On the record before us, we hold that petitioners have not proven that the portion of the parsonage allowance used to repay the church loans was used to provide a home as required by section 107. Accordingly, we sustain respondent's disallowance of these amounts. Excludability of Income Due to Tuition Waivers
*325 Petitioners received tuition reductions for their children's education at the school by virtue of petitioners' employment by the church and the school. Section 117(d), which applies to education furnished after June 30, 1985, provides that gross income does not include any "qualified tuition reduction". "Qualified tuition reduction" refers to any reduction in tuition provided to an employee of an educational organization for the education at such organization of such employee or for the education of any person treated as an employee under the rules of section 132(f). Sec. 117(d). Section 132(f) provides that dependent children are treated as employees for purposes of section 132(a)(1) and (2), which provides for exclusion from income of certain fringe benefits. The parties agree that, for education provided to petitioners' children after June 30, 1985, the tuition reductions are not to be included in petitioners' gross income. Petitioners contend that the tuition reductions before June 30, 1985, are excludable because section 117(d) "merely made explicit in the law that which had been implicit previous thereto." Petitioners assert that, prior to the enactment of section 117(d), *326 section 132(a), (b), and (c)(4) and the regulations under section 117(a) governed the tuition issue in this case. Section 117(a) provides for the exclusion from gross income of any amount "received as a qualified scholarship by an individual who is a candidate for a degree at an educational organization". Petitioners cite the last sentence of section 1.117-3(a), Income Tax Regs., as support for their contention that the tuition payments are excludable: If an educational institution maintains or participates in a plan whereby the tuition of a child of a faculty member of such institution is remitted by any other participating educational institution attended by such child, the amount of the tuition so remitted shall be considered to be an amount received as a scholarship.
Respondent argues that tuition and education benefits that were provided for petitioners' children by petitioners' employer prior to June 30, 1985, in connection with petitioners' employment, constitute compensation to petitioners that is includable in gross income. Respondent cites the following cases in support of this contention: Armantrout v. Commissioner, 67 T.C. 996 (1977), *327 affd. 570 F.2d 210 (7th Cir. 1978); Fulton v. Commissioner, T.C. Memo. 1983-17; Saunders v. Commissioner, T.C. Memo. 1982-655, affd. 720 F.2d 871 (5th Cir. 1983). Respondent further relies on Knapp v. Commissioner, 90 T.C. 430 (1988), affd. 867 F.2d 749 (2d Cir. 1989), in which tuition payments that were made by New York University to other educational institutions for children of its faculty were not considered scholarships under section 1.117-3(a), Income Tax Regs., and were held to be includable in the income of the faculty. In affirming Knapp, the Court of Appeals for the Second Circuit stated: the Regulation is clearly attempting to distinguish between tuition assistance payments that are a quid pro quo for a particular employee's services, and those that are not. The Regulation exempts tuition payments where the paying institution receives no direct benefit from the services of the employee and the payments in question are not direct compensation. We cannot say this is a wholly irrational *328 line to draw. [Knapp v. Commissioner, 867 F.2d 749, 752 (2d Cir. 1989), affg. 90 T.C. 430 (1988).]
See also Wheeler v. United States, 768 F.2d 1333, 1337 (Fed. Cir. 1985). Here, as in the Knapp case, the tuition benefit was provided by petitioners' employer, not by another institution. Thus, section 1.117-3(a), Income Tax Regs., is not applicable either on its face, because it refers to tuition remitted by a school other than the parent's employer, or as interpreted by the Court in Knapp v. Commissioner, supra.
The scholarship exemption in section 117(a) is to be construed narrowly, Bingler v. Johnson, 394 U.S. 741, 751-752 (1969), and the opinion in Knapp makes clear that the scope of the exclusion, before the passage of section 117(d), does not include the tuition reduction in this case, in which the paying institution (the school) did receive a direct benefit from the services of petitioners. Because the tuition for petitioners' children was reduced by petitioners' employer, we hold that the amounts of the tuition reductions are not *329 considered scholarships and, thus, are includable in petitioners' income. Deduction for State Taxes
Petitioners argue that they are entitled to additional deductions for State taxes. Petitioners presented no evidence to support this claim at trial. Subsequent to trial, respondent conceded an additional deduction for petitioners of $ 838. Petitioners have not proven that they are entitled to any further deduction. Late Filing Addition to Tax
Section 6651(a)(1) provides for an addition to tax for failure to file timely a tax return unless it is shown that the failure is due to reasonable cause and not to willful neglect. The burden of proof is on petitioners to show that the failure is due to reasonable cause. United States v. Boyle, 469 U.S. 241, 245 (1985). Petitioners filed their 1986 return on October 19, 1987. Petitioners presented no documentary evidence that they received extensions of time to file their 1986 Federal income tax return. Petitioners' return preparer, John Wurts (Wurts), testified that petitioners extended the time for filing their 1986 return twice and he knew that petitioner executed an extension because he *330 knew that petitioner never filed late. Such general and uncorroborated testimony does not satisfy petitioners' burden of proving that their 1986 return was filed after the normal deadline pursuant to a valid extension. See Hiner v. Commissioner, T.C. Memo. 1993-608; Estate of Haydel v. Commissioner, T.C. Memo. 1991-507, affd. without published opinion 988 F.2d 1213 (5th Cir. 1993); Morrison Industries, Inc. v. Commissioner, T.C. Memo. 1962-155. Petitioners claim that they did not have proof of the granting of an extension because respondent untimely raised the section 6651 issue after the 3-year period prescribed in section 6501(a). Petitioners do not argue that the notice of deficiency was not timely with respect to 1986 but rather that the mailing of the notice after the expiration of the statutory period should shift the burden of establishing the validity of the section 6651 determination to respondent. Petitioners present no authority for shifting the burden of proof under these circumstances, and we decline to do so. They try to explain their failure *331 to produce a copy of the alleged extension by the lapse of time, during which Wurts claims to have discarded his copy. We are not persuaded by this rationale. Respondent maintains that respondent would be prejudiced if we were to allow petitioners, in effect, to raise a statute of limitations issue for the first time on brief, because respondent would have presented evidence regarding a consent to extend the period of limitations executed by both parties if the issue had been raised timely. The expiration of the period of limitations on assessment is an affirmative defense, and petitioners must plead that defense. Rules 39, 142. Because petitioners failed properly to plead the statute of limitations defense, respondent had no reason to present evidence that a consent was executed. In the absence of evidence of a Valid extension, we hold that petitioners are liable for the section 6651(a) addition to tax. Decision will be entered under Rule 155.